Harold W. EVERSON and Partners Agency, Inc., Plaintiffs and Appellees,

v.

PARTNERS LIFE INSURANCE COMPANY and its successor, Bankers Union Life Insurance Company, a Foreign Corporation, Defendants and Appellants.

Civ. No. 9442.

Supreme Court of North Dakota.

July 26, 1978.

Robert W. Palda, of Palda & Slorby, Minot, for plaintiffs and appellees.

Jonathan C. Eaton, Jr., of Eaton & Van de Streek, Minot, for defendants and appellants.

VOGEL, Justice.

The plaintiff Everson was the organizer and first president of Partners Life Insurance Company, which later merged with the defendant Bankers Union Life Insurance Company. He was doing business as Partners Agency, Inc., and was the sole general agent for Partners Life Insurance Company from August 1, 1966, through November 1, 1971. He sued for overriding commissions he claimed to be entitled to as general agent in the amount of about $380,000, for an accounting, for punitive damages, and for damages for the Company's wrongful payment of money to which he was entitled to the Internal Revenue Service, which claimed a lien. The jury gave no punitive damages. The claim of wrongful payment to the Internal Revenue Service was apparently abandoned. The jury verdict was in favor of Everson in the amount of $160,460.62 for unpaid commissions. The defendants appeal. The jury also awarded the defendants the full amount of a counterclaim in the amount of $19,888.54. The plaintiff does not appeal from the award of the counterclaim. The only issues before us relate to the verdict in favor of the plaintiff for unpaid commissions.

## I. STATUTE OF LIMITATIONS

The employment of Everson terminated in 1971. The action was commenced on or about May 15, 1974. The defendants contend that all claims prior to May 15, 1968, are barred by the six-year statute of limitations, Section 28–01–16, N.D.C.C. Defendants cite *Erenfeld v. Erenfeld,* 196 N.W.2d 406 (N.D.1972), holding that an account consisting only of charges on one side and payments on the other is not a mutual account, but a simple open account, and the items in the account outlaw individually six years after the indebtedness arose.

The account before us is different, however. Everson, as a general agent, was not only entitled to commissions during the period of his service but continuing overriding commissions on business in force thereafter. The principal item of dispute is whether the defendants had authority to deduct from Everson's commissions indebtedness of sub-agents who sold insurance. The defendants made deductions from commissions due Everson under a provision of the contract, to be discussed below, the meaning of which is in dispute.

We have held that an account involving only charges on the one side and payments on the other is not a mutual account, but a simple open account. *Hansen v. Fettig,* 179 N.W.2d 739 (N.D.1970); *Erenfeld v. Erenfeld, supra.* However, the account before us is not a simple open account but a mutual account, in which there is, on the part of Everson, a periodic entitlement to payments, and periodic (disputed) deductions from that account, as well as some payments from it to the Internal Revenue Service.

"Mutual account" is defined in *In re Vicen's Estate,* 1 Wis.2d 193, 83 N.W.2d 664, 667 (1957), as

" . . . an account wherein are set down by express or implied agreement by the parties concerned a connected series of debit and credit entries of reciprocal charges and allowances, where the parties intend that the individual items of the account shall not be considered independently, but as a continuation of a related series, and that the account shall be kept open and subject to a shifting balance as additional related entries of debits and credits are made thereto, until it shall suit the convenience of either party to settle and close the account; . . ."

We hold that the account we are concerned with is a mutual account and that the statute of limitations does not bar items in the account between the parties more than six years prior to the commencement of the action, so long as the latest item is less than six years old.

This conclusion is supported by the language of the contract, which provides for periodic statements of the account to be prepared by the company. See II, below.

## II. DOES THE CONTRACT BAR CLAIMS MADE MORE THAN ONE YEAR AFTER NOTICE?

The contract between Everson and the defendants provides, in part:

"SECTION K:

"The company shall monthly furnish the Agency a statement of its account and the agency submit any objection to said statement in writing to the Company at its Home Office within one year."

Nothing is said in the contract as to what consequences, if any, are to flow from the failure of Everson to object to the statement within one year. Defendants construe the contract to mean that all objections not made within the year are barred by the quoted provision. Everson asserts that the provision is ambiguous in that no consequences are stated, and that a jury question is presented as to the meaning of the terms used and the intention of the parties. The trial court agreed, and instructed the jury to resolve the ambiguity by determining the intention of the parties. We quote the instruction on this point in full:

"Language of the Contracts

"Among other portions of the Contracts received in evidence that you are entitled to study and review in your deliberations, are portions of the Agency Contract designated as:

"Section C: Commissions
"Section K: On monthly statements
"Section L: On indebtedness owing to the Company

"To some extent the witnesses in this action have offered varying contentions to the construction of Contracts including the portions just designated.

"You should resolve any ambiguity in the Contracts by determining what the parties intended by the language used. In seeking the intent of the parties, you should consider the contract as a whole and the circumstances under which it was made. Language should be given its ordinary meaning unless it is clear that a special meaning was intended. The intent of the parties may also be gathered from conduct or dealings of the contract-

ing parties showing that they construed the doubtful language in the same sense."

We find no error. We have held on several occasions that an ambiguity exists when good arguments can be made both ways.[1] That is true here. It is certainly arguable that the contract implies a bar to objections not made within the year; on the other hand, it can be argued that no penalty is stated and none should be implied, and that the conduct of the parties is such that the jury could well conclude that no bar was intended.

A jury question was presented.

## III. IS THE EVIDENCE INSUFFICIENT TO SUPPORT THE VERDICT?

Our review of the facts is limited to a consideration of whether there is substantial evidence to sustain the verdict. If there is, we are bound by the verdict. *Jamestown Terminal Elevator, Inc. v. Hieb,* 246 N.W.2d 736 (N.D.1976); *Waletzko v. Herdegen,* 226 N.W.2d 648 (N.D.1975). We review the evidence in the light most favorable to the verdict. *Kresel v. Giese,* 231 N.W.2d 780 (N.D.1975). We do not disturb verdicts arrived at on evidence which is in conflict and from which reasonable men might draw different conclusions. *Watkins Products, Inc. v. Stadel,* 214 N.W.2d 368 (N.D.1973).

The defendants, of course, do not dispute these general statements of our function. The specific point they make is that, in their view, the evidence presented by Everson is unreliable and incomplete and does not supply a rational basis for the verdict reached. They point out that Everson did not support his claim by an analysis of the insurance company records, which were available to him at the Denver office of the company, but instead based his computations on reports of gross premiums made to the North Dakota Insurance Commissioner, from which calculations were made which supported his claim of entitlement to some $380,000. They point out that they estab-

---

1. *Johnson v. Auran,* 214 N.W.2d 641 (N.D. 1974); *In re Estate of Johnson,* 214 N.W.2d 112 (N.D.1973).

lished, by cross-examination or otherwise, that the computations were inaccurate, or potentially inaccurate, in approximately 12 different respects, including failure to reduce the claim by the amount of premiums on lapsed policies which were assigned to another agent and reinstated by him, certain expenses paid by the company for Everson, premiums paid on a life insurance policy on his life, and payments made by reason of an assignment to creditors, and failure to eliminate premiums in group health policies in which Everson had no interest. Some of these contentions were conceded by Everson to be correct. Everson, on the other hand, points out that the fact that the verdict was in an amount less than half the amount of his computations proves that the jury made allowances for the challenged items.

The question before us is whether there was substantial evidence to support the verdict. It may be that we, or a different jury, might give more weight to the testimony of the defendants than the jury in question did, but there is substantial evidence to support the verdict, and the verdict must stand. It is not a function of the Supreme Court to make computations to show how the jury arrived at its verdict. *Regan Farmers Union Co-op. v. Swenson,* 253 N.W.2d 327 (N.D.1977). It is enough that there is substantial evidence to support the verdict. The jury is not required to take the testimony of either side at full face value, nor is there any requirement that one method of proof must be used in preference to another,[2] if both provide substantial bases for a determination by the trier of fact.

IV. DID THE COURT ERR IN PERMITTING THE JURY TO FIND AN AMBIGUITY AS TO THE RESPONSIBILITY OF EVERSON FOR DEBTS OF SUBAGENTS AND TO DISALLOW CHARGE–OFFS AGAINST EVERSON FOR DEBTS OF SUBAGENTS?

This appears to be the principal issue between the parties.

We quoted in full above the court's instruction to the jury as to ambiguity. Section L of the contract, referred to in the instruction, reads:

"SECTION L:

"Any indebtedness owing to the Company by the Agency whether arising under this contract or otherwise and any indebtedness of any sub-agent incurred after the date of this Contract and while under the supervision of the Agency shall be a first lien against any commissions provided herein, and the Agency hereby assigns, transfers and sets over to the Company any monies that from time to time may become due it under this Contract or otherwise (except proceeds of Life Insurance policies in which the Agency has an interest as either owner or beneficiary) to secure such indebtedness, and any monies due the Agency shall first be applied to liquidate such indebtedness to the Company."

The dispute arises over the meaning of the phrase "and while under the supervision of the Agency."

The evidence indicates that during the time Everson was general agent and the company was located in Minot, prior to its move to Billings, Montana, and subsequent merger with Bankers Union Life Insurance Company, advances made to subagents by the company were not deducted from Everson's overriding commissions. Later, they were.

It appears that the practice of the defendants was to advance half of a subagent's premium to him at the time the business was submitted, and the second half after the first premium was paid. If the premium was not paid for any reason, advances would be charged back against the subagent. Even if the premium was eventually paid, there was always a delay between the submission of the application and the delivery of the policy, and during that time the advance to the subagent would be

2. *Amoco Oil Co. v. State Highway Dept.,* 262 N.W.2d 726 (N.D.1978).

charged against him. Thus, most of the time, a subagent would be in a position of owing money to the company. After the policy of the company was changed and the indebtedness of the subagents was charged against Everson, as general agent, purportedly in accordance with Section L, quoted above, Everson also would appear on the books of the company to be indebted to it. The company, after the move to Billings, regularly subtracted such debts of subagents not paid by them from the renewals due Everson, and it asserts that it was entitled to do so under the language of Section L.

It also appears that subagents could, and very often did, obtain advances from officers of the company (not Everson) for various purposes, including payment of operating expenses while awaiting payment of commissions. Many times the subagents obtained such advances and did not repay them, with the result that the subagent owed the company money which the company charged against Everson. Everson objects to such charge-offs, as well as the others mentioned above.

It is Everson's position that such advances, either on new business or otherwise, are not chargeable back to him under Section L because, in almost all cases, the subagent, at the time of obtaining the advance, was not "under the supervision of" Everson or his agency.

Contractual provisions relative to this dispute include Section L, quoted above, and the following:

"WITNESSETH, that said Partners Agency, Inc. is hereby appointed as the agency of the Company for the purpose of recruiting, recommending, supervising, training, and assisting in management of agents in the sale and securing of life insurance policies for the Company. In addition to those agents recruited by the Agency, other agents may be assigned to the Agency by the Company with the consent of the Agency. Subject to the terms, conditions, and limitations herein set forth, the parties hereto do hereby covenant and agree as follows:

"SECTION I:

"All sub-agents recommended by the Agency will be contracted directly with the Company and the Agency hereby authorizes the Company to pay commissions directly to the sub-agent in accordance with the contract entered into between the parties and such commissions paid are a reduction of commissions provided for in this agreement. In the event of termination of any sub-agent's contract, renewal commissions on business produced by the sub-agent revert to the Agency."

It is Everson's position that he was obligated to, and did, recruit subagents, recommend them to the company, supervise them during their training period, train them, and assist in management of them. However, he denies that he supervised all subagents at all times, and he particularly denies that he supervised them after their training period. He asserts that he should not be, and cannot be, required to repay advances made without his knowledge or consent to subagents who applied directly to the officers of the company, and were given advances without the knowledge or consent of Everson.

As indicated, the trial judge considered that the contract and the practices of the parties created an ambiguity as to whether agents who received advances were "under the supervision" of Everson and his agency. The jury obviously determined that they were not under such supervision, and therefore disallowed the company's charge-backs of the debts of subagents against Everson's account.

Again, we believe that the court was within its discretion in determining that there was an ambiguity and in allowing the jury to resolve the ambiguity by a determination of the intention of the parties under the instruction quoted above.

The evidence is sufficient and we find no error. The judgment is affirmed.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.