Kenneth A. SMITH, Plaintiff
and Appellee,

v.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY and James Erickson,
Defendants and Appellants.

Civ. No. 9635.

Supreme Court of North Dakota.

June 20, 1980.

Lowell A. O'Grady, of O'Grady & Morley, Grand Forks, and Cameron D. Sillers, Langdon, for plaintiff and appellee; argued by Lowell O'Grady, Grand Forks.

Robert B. Hunter, Grand Forks, for defendants and appellants.

VANDE WALLE, Justice.

American Family Mutual Insurance Company ("American Family") appeals from a judgment entered against it upon a jury verdict in favor of Kenneth A. Smith. It also appeals from the trial court's order denying its motions for judgment notwithstanding the verdict or, in the alternative, a new trial. We affirm.

In February 1976, American Family, through James Erickson as agent, sold an automobile insurance policy to Smith providing liability and collision coverage for Smith's 1970 automobile. At that time Smith was working as a contract deputy sheriff in Wildrose, North Dakota. There is some dispute in the testimony as to whether or not Erickson was informed that Smith used his automobile in his police work although Smith's automobile was specially equipped for police work. Subsequently, Smith accepted employment as chief of police at Pembina, North Dakota. On June 10, 1976, Smith, while off duty and driving his own automobile, answered an assistance call from a deputy sheriff in Cavalier County. The deputy was pursuing a van and, according to Smith's testimony, he asked the deputy if he (Smith) should set up a roadblock. Smith testified that the officer replied in the affirmative and Smith did drive his car crosswise on the two-laned highway, blocking the northbound lane. Smith placed a revolving red light on the top of his car and waited on the side of the road. The driver of the van which was being pursued did not stop and ran into

Smith's car, demolishing it. Smith reported the loss to Erickson but Erickson told Smith the loss was not covered.[1]

Smith and his wife, Joyce, lived in Langdon; Joyce worked in Cavalier and Smith also needed a car to drive to work in Pembina. Because they both needed automobiles to drive to work, Smith was anxious to have his claim settled. Smith asked Erickson on several occasions when an insurance adjuster would come to investigate the claim. Erickson told Smith the adjusters were busy. On June 24, an independent adjuster did investigate the accident. He agreed on the amount of the loss but requested that Smith sign a nonwaiver agreement, which the adjuster also executed on behalf of American Family, wherein Smith and American Family agreed that any action taken by American Family in investigating the accident would not operate to invalidate any of the provisions of the policy and that if a suit were filed as a result of the accident and American Family elected to defend the suit, such action would not be construed as a waiver of any of the conditions of the policy. The agreement further provided:

> "It is the intention of this agreement to preserve all the rights of the parties hereto and provide for an investigation of the said accident without in any way affecting, impairing or adding to the liability of the Company under said policy or under any statutes or the common law, and no act of the Company hereunder shall be construed as an admission of its liability or coverage."

Although Smith was asked to execute and did execute the agreement, he testified the agent told him that in his opinion the collision was covered and Smith should get a check in a week or two. When Smith contacted Erickson inquiring why the check was not forthcoming, Erickson told him the reason could be that the loss was not covered. Smith had another car he owned, which had motor problems, repaired for $770 in order that he and his wife would have cars to drive to their places of employment. American Family paid the claim for the loss of Smith's car some two months later. Prior to the time the check arrived, Erickson, when asked about the delay, gave various excuses including the response that there was no coverage under the policy. When the check did arrive, Erickson told Smith the only reason American Family paid the loss was that the adjusters had determined that a badly hurt passenger (Herzog) in the van which collided with Smith's automobile had decided not to sue Smith.

Herzog did sue Smith later. Smith immediately delivered the papers to Erickson. Erickson told Smith that American Family was not named in the lawsuit and therefore the company did not have to defend Smith, and that Smith must secure his own attorney to defend the suit because American Family was not liable. Smith became very upset and contacted an attorney (Sillers) who agreed to represent Smith for $50 per hour.

Sillers contacted Harrington, American Family's claim counsel, by telephone on September 29, 1976, inquiring as to what American Family was going to do on the defense of the Herzog lawsuit. Harrington informed Sillers he had called Herzog's attorney and asked for an extension to file an

---

1. The insurance policy provided:

"The company shall pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage arising out of the ownership, maintenance or use of an owned automobile or the use of a non-owned automobile, and the company shall defend with counsel of its choice any suit alleging such bodily injury or property damage and seeking damages which are payable under the terms of this policy, even if any of the allegations of the suit are groundless, false or fraudulent; but the company may make such investi-

gation and settlement of any claim or suit as it deems expedient."

The policy contained a further provision that coverage did not apply "to liability assumed by the insured under any contract or agreement."

American Family apparently had taken the position that Smith's actions in equipping the insured vehicle with a revolving red light, a special police radio and firearms, and using his car as a roadblock brought into play this exclusion. The interpretation of the policy terms as applied to the facts is not one of the issues before us.

answer. He also told Sillers the matter was being forwarded to the Letnes & Marshall law firm in Grand Forks to commence a declaratory-judgment action to determine American Family's liability under the insurance contract. Harrington told Sillers it was American Family's position that when Smith agreed with the deputy sheriff of Pembina County to use Smith's car as a roadblock it came within the provision of the policy excluding liability assumed by the insured under any contract or agreement.

In October 1976, Sillers called American Family and asked for an immediate decision by American Family on the matter of defending Smith in the action brought against him by Herzog. Sillers spoke with Harrington, who told Sillers he would deny the claim. Harrington then wrote a letter on October 11, 1976, to Sillers denying coverage on the part of American Family. Sillers commenced this lawsuit against American Family on Smith's behalf on October 18, 1976. Subsequently, Sillers received a copy of a letter from American Family's claim counsel, Harrington, addressed to the Letnes & Marshall law firm of Grand Forks, requesting that firm to defend American Family and Erickson in the lawsuit filed by Smith against them. In that letter Harrington suggested filing a counterclaim against Sillers for abuse of process in the amount of $1,000,000. Because of that letter Sillers advised Smith there might be a conflict of interest if he were sued by American Family and continued to represent Smith in the lawsuit against American Family. Smith requested Sillers to continue in the lawsuit but, at Sillers's suggestion, another attorney was retained to work with Sillers in the matter.

In January 1977, Sillers told Smith that American Family had reversed its position and would take over Smith's defense in the action brought by the passenger in the van, but the company refused to pay Sillers the full $50 per hour. Sillers advised Smith that if he accepted American Family's offer, Smith would still owe him the difference between the $50 per hour agreed upon as his fee and the amount American Family

agreed to pay. Smith told Sillers to use his best judgment. American Family did take over defense of the lawsuit against Smith but made no direct contact with Smith prior to the trial of this action. At the time this action was tried the action against Smith was still pending. The evidence at trial indicated that Smith was upset and worried over the pending action against him, whether or not American Family would defend the action, and whether or not, if a verdict was rendered against Smith, American Family would pay the judgment to the limits of the insurance policy.

In his action against American Family, Smith alleged breach of contract of his automobile liability insurance policy, tortious breach of the implied covenant of good faith and fair dealing, malice, oppression, and fraud, and intentional infliction of severe emotional distress on the part of American Family. After trial to a jury, the jury found that Smith failed to prove he suffered severe emotional distress caused by the conduct of American Family; the jury dismissed any claim against American Family's agent, James Erickson; but found against American Family in the sum of $4,120 for breach of contract, $3,000 for breach of an implied covenant of good faith and fair dealing, and $50,000 for exemplary damages. American Family moved for judgment notwithstanding the verdict or, in the alternative, a new trial. The motion was denied by the district court and American Family took this appeal. In its appeal American Family raises several issues, some of which we will consider separately and others together.

I

■ In its first issue American Family argues that the trial court erred in refusing to dismiss Smith's action in tort because it failed to state a claim upon which relief could be granted. American Family's position is that a failure to defend an insured as required by the insurance policy is a breach of contract on the part of the insurer and does not constitute a tort on the part of the

insurer. In support of its position American Family cites *Prince v. Universal Underwriters Insurance Co.*, 143 N.W.2d 708 (N.D. 1966), in which this court held that a failure to defend was a breach of the insurer's obligation under the policy which renders the insurer liable to the insured to the extent of the insured's costs and expenses incurred in defending the action. The decision in *Prince* is not applicable to the issue raised by American Family. In *Prince* the insured brought an action against the insurer for failure to defend under a liability policy but the action brought by the insured sought only the maximum amount of the property-damage coverage under the liability policy plus the amount of attorney fees and costs incurred by the insured in the defense and settlement of actions brought against him by third parties. The court never considered the issue which American Family now raises, but rather was concerned only with the coverage under the insurance policy and whether or not the attorney fees and costs awarded by the trial court were properly recoverable under the facts of the case. The insurer had argued that because its liability under the policy was limited, the full amount of attorney fees and expenses incurred by the insured in defending and settling actions brought against him should not be charged to the insurer. The court's statement that the insurer's failure to defend was a breach of the insurance contract for which the insurer is liable to the insured to the extent of the insured's costs and expenses incurred in defending actions against him was made in response to that argument and did not purport to answer the issue of whether or not an insurer may be liable in tort for a failure to defend the insured. In *Prince* the insured did not bring action against the insurer in tort nor did the court consider whether or not that action was permitted. Furthermore, since the decision in *Prince*, this court decided *Corwin Chrysler-Plymouth v.*

*Westchester Fire Insurance Company*, 279 N.W.2d 638 (N.D.1979), wherein we quoted with approval the following statement of the Oklahoma Supreme Court in *Christian v. American Home Assurance Company*, 577 P.2d 899, 904–905 (Okl.1978):

" 'We approve and adopt the rule that an insurer has an implied duty to deal fairly and act in good faith with its insured and that the violation of this duty gives rise to an action in tort for which consequential and, in a proper case, punitive, damages may be sought. We do not hold that an insurer who resists and litigates a claim made by its insured does so at its peril that if it loses the suit or suffers a judgment against it for a larger amount than it had offered in payment, it will be held to have breached its duty to act fairly and in good faith and thus will be liable in tort." 279 N.W.2d at 645.

In *Corwin Chrysler-Plymouth*,[2] we also cited and relied upon *Gruenberg v. Aetna Insurance Company*, 9 Cal.3d 566, 108 Cal. Rptr. 480, 510 P.2d 1032 (1973), and *Mustachio v. Ohio Farmers Insurance Company*, 44 Cal.App.3d 358, 118 Cal.Rptr. 581 (1975), in affirming a decision of the district court that an insurer, which initially refused to pay a portion of an embezzlement claim representing funds taken subsequent to the expiration of its policy but which continued to refuse to pay after being informed that the embezzler had admitted the funds had been taken prior to the expiration of the policy, did, under the facts of that case, breach its obligation to deal with its insured in good faith.

American Family attempts to distinguish this holding on the basis that *Corwin Chrysler-Plymouth* and the California decisions upon which it relies give rise to tort liability only where the insurer fails to accept a reasonable settlement and not where, as here, there is only a wrongful refusal by an

---

**2.** Our decision in *Corwin Chrysler-Plymouth* was not announced until May 22, 1979. Judge Heen's memorandum decision denying American Family's motions for judgment notwithstanding the verdict or, in the alternative, a motion for a new trial was issued on March 3, 1979. Judge Heen cited *Gruenberg v. Aetna Insurance Company*, 9 Cal.3d 566, 108 Cal. Rptr. 480, 510 P.2d 1032 (1973), as illustrative of the development of the law holding the insurer liable to the insured in tort for a breach of the implied duty of good faith and fair dealing.

insurer to defend an insured. It points to *Comunale v. Traders & General Insurance Company,* 50 Cal.2d 654, 328 P.2d 198 (1958), and *Hogan v. Midland National Insurance Co.,* 3 Cal.3d 553, 91 Cal.Rptr. 153, 476 P.2d 825 (1970), as supporting its position. *Comunale* involved an action against an insurer to recover the portion of a judgment which was in excess of policy limits. The California Supreme Court held that where the insurer wrongfully refused to defend the insured and refused a reasonable settlement within limits of the policy, the insurer's breach of its express obligation to defend did not release it from its implied duty to consider the insured's interest in settlement. The court held the insurer liable for the entire judgment rendered against the insured even though the judgment exceeded policy limits. The discussion by the California court noted that most of the cases dealing with the insurer's failure to settle involve an insurer which had assumed the defense of the action against the insured but further noted that the decisive factor in fixing the extent of the insurer's liability in the case before it was the refusal to accept an offer of settlement within the policy limits, not the refusal to defend. The insurer in *Comunale* never assumed the defense of the insured. As dictum the California court noted that where there is no opportunity to compromise the claim and the only wrongful act of the insurer is the refusal to defend, the liability of the insurer is ordinarily limited to the amount of the policy plus attorney fees and costs; the rationale being that if the insured has employed competent counsel to represent him, there is no ground for concluding that the judgment would have been for a lesser sum had the defense been conducted by the insurer's counsel and that the detriment suffered by the insured as a result of a judgment in excess of the policy limits was not proximately caused by the insurer's refusal to defend.

*Hogan* cited *Comunale* for the proposition that the insurer is liable for amounts over the policy limit because of its wrongful refusal to settle the underlying action and noted the *Comunale* opinion distinguished

the consequences of a wrongful refusal to settle and a wrongful refusal to defend, pointing out that as to a wrongful refusal to defend the liability of the insurer is ordinarily limited to the amount of the policy plus attorney fees and costs.

Although we believe the statements of the California Supreme Court in *Comunale* and *Hogan* to be dicta as used in those opinions, we note both opinions were issued prior to the 1973 decision in *Gruenberg v. Aetna Insurance Company, supra.* Although *Gruenberg* did not involve a third party, but rather involved the failure of the insurer to pay the insured under a fire insurance policy for a fire loss incurred by the insured, the Court referred to the decisions in *Comunale* and *Crisci v. Security Ins. Co.,* 66 Cal.2d 425, 58 Cal.Rptr. 13, 426 P.2d 173 (1967), and stated:

"Thus in *Comunale* and *Crisci* we made it clear that '[l]iability is imposed [on the insurer] not for a bad faith breach of contract but for failure to meet the duty to accept reasonable settlements, a duty included within the implied covenant of good faith and fair dealing.' (*Crisci, supra,* 66 Cal.2d at p. 430, 58 Cal.Rptr. at p. 17, 426 P.2d at p. 177.) In those two cases, we considered the duty of the insurer to act in good faith and fairly in handling the claims of third persons against the insured, described as a 'duty to accept reasonable settlements'; in the case before us we consider the duty of an insurer to act in good faith and fairly in handling the claim of an insured, namely a duty not to withhold unreasonably payments due under a policy. These are merely two different aspects of the same duty. That responsibility is not the requirement mandated by the terms of the policy itself—to defend, settle, or pay. It is the obligation, deemed to be imposed by the law, under which the insurer must act fairly and in good faith in discharging its contractual responsibilities. Where in so doing, it fails to deal *fairly and in good faith* with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy,

such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing.

. . . . .

"It is manifest that a common legal principle underlies all of the foregoing decisions; namely, that in every insurance contract there is an implied covenant of good faith and fair dealing. The duty to so act is imminent in the contract whether the company is attending to the claims of third persons against the insured or the claims of the insured itself. Accordingly, when the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort." 9 Cal.3d at 573–575, 108 Cal.Rptr. at 485–486, 510 P.2d at 1037–1038.

Significantly, the court in *Gruenberg*, relying upon its decision in *Crisci, supra,* upheld recovery for mental suffering and emotional distress because an action against an insurer for breach of its implied duty of good faith sounds in tort as well as contract. We cannot differentiate between a failure to pay, as in *Gruenberg*, and, here, a failure to defend, if the insurer breaches its covenant to act fairly and in good faith in discharging its contractual responsibilities. Insofar as claims for emotional distress and mental suffering are made, the failure of the insurer to defend the insured against a multithousand-dollar action filed by a third party against the insured may be significantly greater than the failure to pay a claim to the insured under a fire policy such as in *Gruenberg*. To limit the recovery by the insured and the liability of the insurer to the amount of the policy plus attorney fees and costs in instances in which the insured has breached its duty to act fairly and in good faith by failing to defend the insured would, in many instances, preclude recovery by the insured for damages for emotional distress.

In *Farris v. U. S. Fidelity and Guaranty Co.,* 284 Or. 453, 587 P.2d 1015 (1978), the Oregon Supreme Court considered the issue of whether or not the failure of the insurer to defend the insured under a liability policy could give rise to a tort action. The majority of the Oregon court concluded that, in view of its previous decision in *Santilli v. State Farm Life Ins. Co.,* 278 Or. 53, 562 P.2d 965 (1977), an insurer's failure to undertake representation of the insured could only have been a breach of contract for which no recovery for mental distress because of threat of pecuniary loss was available. In reaching its decision, the majority in *Farris* relied in part upon the unfair-trade-practices provisions of that State's Insurance Code (Or.Rev.Stat. Chapter 746) and the civil penalties provided for the violation of the Insurance Code (Or.Rev. Stat. Section 731.988). Similar provisions are found in our statutes. Secs. 26–30–04 and 26–30–11, N.D.C.C. The Oregon court also recognized a distinction between failure of the insurer to settle within the policy limits and failure to defend, concluding that in the case of failure to settle the insurer was acting in a fiduciary capacity which imposed a higher duty of good faith and fair dealing upon the insurer, but that failure to defend was merely a breach of contract for which no recovery for mental distress because of threat of pecuniary loss is recoverable.

Significantly, however, the Oregon court recognized that *Gruenberg* and related decisions would permit an action in tort for failure to defend but refused to adopt the rationale of those decisions, stating:

"The California courts have not, however, made the distinction pointed out here or in *Santilli* but have, without recognition that it was the fiduciary position of the insurer which arises when it represents the insured in litigation which gives rise to the good faith language, transposed the language into cases in which insurance companies have not undertaken representation of the insured at all. As a result, they have held an action in tort can lie for the breach of contract.

. . . . .

"Contrary to the California holdings, for the reasons given in *Santilli*, we believe defendant's failure to undertake representation of plaintiffs which re-

quired them to represent themselves could only have been a breach of contract, and, in cases of breach, the law is clear that no recovery for mental distress because of threat of pecuniary loss is recoverable." 284 Or. at 464–465, 587 P.2d at 1021.

The minority opinion in *Farris* would have permitted the tort action for failure to defend, stating:

"In fact, the basis of liability insurance is not just the assumption of actual cost and losses that result from a lawsuit but also the assumption of the risk of being sued, of the selection of an attorney, of the responsibility and control of the litigation, and even of the risk of losing. It is because of this special responsibility and relationship arising from the contract, rather than any implied covenant of good faith in the insurance contract, that the law imposes a duty of good faith on the insurer and thus the bad faith breach of a liability insurance contract is a tort.

. . . . .

"In fact, under the majority opinion in *this* case of bad faith refusal to perform the liability insurance contract, all the insurer has to lose is the costs and losses it would have borne anyway if it had accepted the case. If anything, a liability insurer intending to breach its contract in bad faith is encouraged to do so at the outset rather than risk the tort liability applicable to bad faith breaches *in performance.*" 284 Or. at 477–478, 587 P.2d at 1028.

We adopted the rationale of *Gruenberg* in *Corwin Chrysler-Plymouth.* The Oregon Supreme Court has rejected that rationale but its decision in *Farris* reveals that it also finds *Gruenberg* and related decisions applicable to failure to defend as well as failure to settle within the policy limits.

■ An insurer's obligation to defend and an insurer's obligation to indemnify are separate and distinct contractual elements. *Afcan v. Mutual Fire, Marine and Inland Ins. Co.,* 595 P.2d 638 (Alaska 1979). We agree with the trial court that the defense and vindication of an insured by his insurance carrier against third-party claims is one of the chief benefits of the insurance contract.

■ Smith's cause of action in this instance alleged tortious breach of the implied covenant of good faith and fair dealing, malice, oppression, and fraud against American Family. That allegation was predicated on American Family's failure to defend as required by its policy with Smith. To adopt a rationale that distinguishes between the insurer's failure to defend and the failure to accept a settlement would, as the trial court noted in its memorandum opinion denying American Family's post-trial motions, "encourage insurance companies to exert whatever coercion in whatever manner and under whatever circumstances as would serve their financial interest, and under the circumstances here present would leave the plaintiff without a remedy for damages for the failure to defend beyond attorney's fees and legal costs."

■ American Family also argues that even if there is an implied tort remedy for failure by the insurer to defend the insured, Smith's complaint should have been dismissed because it was brought prior to the resolution of the Herzog suit against him. In support of its argument, American Family refers us to the decision in *Critz v. Farmers Insurance Group,* 230 Cal.App.2d 788, 41 Cal.Rptr. 401 (1965), wherein the California Court of Appeals, in deciding whether or not an insured could assign to another party his right to maintain a bad-faith action against his insurer prior to the time he suffered adverse judgment in a personal-injury action, held the insured could make the assignment because the breach of the duty of good faith was complete when it occurred. That court also held, however, that the breach of the duty would not result in an immediately enforceable chose in action against the insurer because of the uncertainty as to the damages—which would be determined only when the insured incurred a binding judgment in excess of the policy limit.

In this instance Smith claimed damages of $4,900 for loss of employment as a result of American Family's failure to defend the action filed against him by Herzog; $300 in costs for repairing an automobile; traveling expenses in the amount of $125; medical expenses in the amount of $115 for treatment and evaluation of mental injury and depression resulting from American Family's failure to defend him; $50,000 for mental distress and emotional injury; and $3,861.89 for legal expenses incurred in defending the lawsuit brought against him by Herzog. In addition, Smith made a claim for future costs of defending the Herzog suit in an unspecified amount. Smith also asked that American Family be required to pay on Smith's behalf all sums for which Smith might be adjudged liable in the suit brought by Herzog and he requested $1,000,000 in exemplary damages. The jury awarded Smith $4,120 for breach of contract; $3,000 for American Family's breach of its obligation to deal fairly and in good faith with Smith; and $50,000 in punitive (exemplary) damages. It is apparent from an examination of the special jury verdict that the jury did not award Smith any speculative damages for a judgment which might be entered against him in the Herzog action. The actual damages which were awarded Smith were for injury he had already suffered. It is best explained by the trial court's memorandum opinion denying American Family's motions:

> "Smith's cause of action is not grounded upon the carrier's refusal to settle, but rather upon the company's refusal to defend, a cause of action complete under the facts of this case at the time of trial. Future refusal to defend is unlikely and should not be presumed. If the plaintiff wishes to chance a splitting of a cause of action then ne takes the election made in this instance."

Because the limit of liability of American Family under the insurance policy was $50,000 and because the jury returned a verdict of $50,000 in exemplary damages, American Family argues that the jury did speculate as to the outcome of the Herzog lawsuit inasmuch as the $50,000 exemplary damages awarded equals the liability limit of Smith's insurance policy. This is conjecture on the part of American Family and a theory we refuse to adopt.

## II

■ American Family also lists as error several instructions given to the jury by the trial court. The first instruction with which American Family takes issue is an instruction regarding the breach of an implied covenant of good faith and fair dealing, malice, oppression, fraud, and compensatory and punitive damages therefor. American Family's argument relative to this group of instructions is essentially the same as is explained in part I of this opinion, i. e., that there is no authority in North Dakota allowing an insured to sue his insurance company in tort on a third-party liability insurance contract for compensatory and punitive damages. We need not again discuss our conclusion with regard to that argument. In conjunction with this issue, however, American Family also argues that there was insufficient evidence to justify submission of such instructions to the jury.

■ Although there was conflicting testimony as to American Family's conduct in handling Herzog's claim against Smith, there was adequate evidence introduced on which to submit the issue of the breach of the implied covenant of good faith and fair dealing, malice, oppression, and fraud to the jury. Without attempting to detail all the facts supporting our conclusion, we note the following evidence introduced at trial: American Family's delay in deciding whether or not to pay Smith's collision claim, causing him additional car expense; Erickson's statements to Smith that American Family would not defend the Herzog lawsuit and that American Family was not required to defend the suit because it was not named as a defendant therein; American Family's conduct in determining to sue any attorney who brought action to obtain coverage and damages for an insured after the company denied liability; American Family's refusal to assume Smith's defense

unless he dropped his claim for damages; and its refusal to pay all of Sillers's fees incurred in representing Smith. We believe there was sufficient evidence introduced at the trial to raise an issue of fact as to American Family's breach of its covenant of good faith and fair dealing, malice, oppression, and fraud. A failure to instruct on these matters would have had the effect of a directed verdict on that portion of the complaint. In determining whether or not a moving party is entitled to a judgment on the merits as a matter of law, the evidence must be evaluated in the light most favorable to the party against whom the motion was made. *Undlin v. City of Surrey*, 262 N.W.2d 742 (N.D.1978). We find no error in the trial court's instructions on these matters.

■ Although American Family argues that if we find no error in these instructions we are holding that American Family had no legal right to contest coverage by seeking declaratory relief while having protected its insured from default, we reject such contention. It was not the fact that American Family sought a declaratory judgment to determine its responsibility under its contract of insurance with Smith that created the liability. Rather, it was the conduct of American Family and its agents during the entire course of events which spawned Smith's cause of action.

■ American Family also attacks the instruction given by the trial court on emotional distress.[3] American Family took exception to the instruction because it did not require "severe" emotional distress as a requisite to a damage award. Although recognizing that *Gruenberg, supra*, upon which we relied in *Corwin Chrysler-Plymouth, supra*, abolished the "severity" requirement, American Family notes that applies only in cases where the claim is actionable and has resulted in substantial damage due to emotional distress. It argues that the only other damage Smith was able to prove was that flowing from breach of contract, i. e.,

attorney fees. There was, however, testimony introduced as to damage other than attorney fees, such as the loss of his job with the City of Pembina because of his job performance and lost employment opportunities in North Dakota, Montana, and Alaska because of prospective employers' learning of his action against his own insurance company. These are not "contractual" damages which would have been paid under the insurance contract. Although there was conflicting evidence introduced as to these damages, they are not unlike the type of damages which the court in *Gruenberg* found sufficient as an award for emotional distress. The jury did not award an excessive amount in damages for breach of the covenant of good faith and fair dealing. The award was $3,000. Moreover, in *Corwin Chrysler-Plymouth, supra*, we quoted with approval *Mustachio v. Ohio Farmers Insurance Company, supra*, which in turn quoted from *Fletcher v. Western National Life Insurance Co.*, 10 Cal.App.3d 376, 401–402, 89 Cal.Rptr. 78, 93–94 (1970), as follows:

> "We further hold that, independent of the tort of intentional infliction of emotional distress, such conduct on the part of a disability insurer constitutes a tortious interference with a protected property interest of its insured for which damages may be recovered to compensate for *all detriment proximately resulting therefrom*, including economic loss *as well as emotional distress* resulting from the conduct or from the economic losses caused by the conduct, and, in a proper case, punitive damages." [Emphasis supplied.]

■ In the alternative, American Family urges that because of our decision in *Whetham v. Bismarck Hospital*, 197 N.W.2d 678 (N.D.1972), the instruction was erroneous in that North Dakota does not recognize recovery for emotional distress without some accompanying physical harm unless the plaintiff was in personal danger of

---

3. The trial court's instruction on damages permitted reasonable compensation "for any pain, discomfort, fears, anxiety and other emotional distress suffered by the plaintiff and for similar suffering reasonably certain to be experienced in the future from the same cause."

physical impact. We agree with Smith that the *Whetham* decision, which involved the witnessing of a tortious act by the plaintiff and involved the impact rule, is not applicable to a tortious breach of an insurer's duty of good faith and fair dealing. Our decision in *Corwin Chrysler-Plymouth* clearly requires us to reject American Family's contention in matters involving an insurer's tortious breach of the duty of good faith and fair dealing.

American Family urges as error the trial court's instruction regarding the intentional inflicting of severe emotional distress. The jury, in returning its special verdict, answered "no" to the following questions:

"Did the plaintiff suffer severe emotional distress caused by the extreme and outrageous unprivileged conduct done with reckless disregard of the probability of causing him emotional distress,

"by defendant American Family?

"by defendant James Erickson?"

█ Despite the jury verdict with regard to this issue, it is American Family's position that there was no evidence to support such an instruction and that by giving the instruction the trial court may have confused or inflamed the passions of the jury. We agree that an issue should not be submitted to the jury where there is no evidence introduced to support a verdict in favor of the party having the burden of proof. In *Frank v. Daimler-Benz, A. G., Stuttgart*, 226 N.W.2d 143 (N.D.1975), this court stated:

"While a mere scintilla of evidence in favor of the party against whom the motion [for dismissal at the end of plaintiff's case] is made does not preclude the granting of the motion, it should be granted only when, without weighing the credibility of witnesses, only one reasonable conclusion can be reached." 226 N.W.2d at 147–148.

See also *Undlin v. City of Surrey, supra.*

Here, we conclude there was more than a "scintilla" of evidence for the jury to consider. There was considerable testimony, although contradicted by other witnesses, that Smith did suffer "severe" emotional distress. The jury was able to weigh this testimony and arrive at a conclusion that Smith did not suffer "severe" emotional distress because of American Family's actions but that does not indicate the trial court erred in giving an instruction on intentional infliction of severe emotional distress.

### III

American Family alleges as error the refusal of the trial court to give the following requested instruction:

"You are instructed that the Defendant American Family has assumed the defense of the Plaintiff in the lawsuit commenced against him by Diane Herzog and has agreed to pay any judgment up to its policy limits of $50,000 in that case. You are instructed to disregard any inference or suggestion that has been made in this trial that the defendant may not fulfill this obligation. . . ."

█ American Family correctly points out that there are references in the testimony that it might "back out" and leave Smith without insurance protection. It concedes that such testimony has a bearing on Smith's emotional condition and is admissible for that purpose but it further argues that such testimony inflames the jury or, at least, causes the jury to speculate. American Family urges us to conclude that the jury did speculate because the $50,000 in punitive damages awarded by the jury equals Smith's liability insurance policy limits. The testimony does, however, indicate that Smith was worried about American Family's "backing out" of its agreement to defend and pay under the limits of the liability policy. The trial court refused to give the requested instruction because such instruction "would in effect have the court commenting upon the evidence." We agree that an instruction such as that requested by American Family would have told the jury that, as a matter of law, American Family would fulfill its obligation. In view of the testimony at trial concerning American Family's posture

as to the claim against Smith prior to American Family's undertaking to defend Smith, there was adequate reason for Smith to continue to be concerned as to American Family's future actions in the matter. We find no error on the part of the trial court in refusing to give the requested instruction.

## IV

At trial a certain portion of the deposition of American Family's expert witness, Dr. Gardner, a psychiatrist, was stricken on motion of Smith's counsel. American Family alleges the striking of this portion of the deposition was error. The stricken testimony concerned the issue of whether or not Smith was malingering. The trial court excluded such testimony, concluding that a "medical expert is qualified to his opinion as to medical certainty or based on medical probability and that only but may not give his opinion as to mere possibilities."

At the deposition, in response to a question from American Family's counsel as to whether or not he had any reason to believe or suspect that Smith may be malingering, based upon a reasonable certainty, Dr. Gardner replied that he did and, when asked what his opinion was, Dr. Gardner responded:

"Well, my opinion is that he may very well be."

American Family urges us to determine, from a careful reading of the deposition in its entirety, that Dr. Gardner's opinion was more than suspicion and was actually based upon reasonable medical certainty. An examination of the entire deposition leads us to conclude that Dr. Gardner was not expressing a reasonable medical certainty because, on cross-examination by Smith's counsel, he admitted that he didn't know that Smith was malingering but only suspected it. We cannot equate suspicion with reasonable medical certainty.

American Family also argues that the trial court, at trial, indicated that a reason for excluding this testimony was that it was based on a test administered by Dr. Gardner and that sufficient foundation had not been laid in regard to this particular test. It points out that Rule 703 of the North Dakota Rules of Evidence does not require that the facts or data need be admissible in evidence if the facts or data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject. We agree that the major effect of Rule 703, as well as Rule 705, of the North Dakota Rules of Evidence is to do away with the prior requirement under North Dakota law that an expert opinion be based upon facts in evidence or assumed to be true hypothetically. *Feuerherm v. Ertelt*, 286 N.W.2d 509 (N.D.1979). In *Feuerherm* we indicated that if the basis of the opinion is weak or nonexistent it goes to the expert's credibility and not to the admissibility of opinion evidence. But there is a difference between the basis for the opinion evidence and the opinion itself. In this instance the trial court concluded there was no opinion based on reasonable medical certainty. Furthermore, a reading of the transcript reveals that the trial court did not base its ruling on the admissibility of the test:

"THE COURT: The record will show with respect to the testimony of an expert witness this court is prepared to rule in the absence of controlling authority to the contrary, and in accord with the general rule, that a medical expert is qualified to give his opinion as to medical certainty or based on medical probability, and that only, but may not give his opinion as to mere possibilities.

"Some discussion has been had in chambers with respect to a test given in conjunction with the diagnosis made by Dr. Gardner. A question has arisen whether the results of the test itself may be received in evidence. Again, this court is prepared to rule that there must be some testimony giving the results on medical probability. If that test served only as one element in the formulation of Dr. Gardner's opinion that test will be ruled inadmissible."

It is clear from this statement that the trial court excluded the "malingering"

testimony because it was not an opinion based on reasonable medical certainty and excluded the test for different reasons. The trial court did not, as alleged by American Family, exclude the "malingering" testimony because it was based on a test which was not admissible or in evidence. We find no conflict between the trial court's ruling and Rules 703 and 705 of the North Dakota Rules of Evidence.

V

The trial court admitted into evidence a letter from American Family's claims counsel, Gary Harrington, to the law firm of Letnes, Marshall & Hunter. By that letter American Family retained the firm to defend the lawsuit brought against American Family by Smith. Harrington further suggested that the defense attorneys bring a counterclaim against Sillers, Smith's counsel, for abuse of process. American Family argues that under Rule 403 of the North Dakota Rules of Evidence[4] the letter should have been excluded because it was written after Smith commenced his lawsuit against American Family, it was not directed at the insured, no counterclaim was interposed, and the letter was prejudicial.

■ Although conceding that the letter was admitted because it tended to show bad faith, malice, or oppression toward Smith, as alleged in the complaint, American Family further argues that it permits Smith to use the company's conduct after the inception of his lawsuit against American Family to prove his claim. We do not agree. The

letter was relevant as being indicative of American Family's relationship with Smith, its insured, and its obligation to deal fairly and in good faith with him. The commentary to Rule 403 by the Procedure Committee of the North Dakota State Bar Association notes that the rule vests wide discretion in the trial court to control the introduction of evidence. In view of the other evidence introduced concerning American Family's attitude toward Smith we find no abuse of discretion on the part of the trial court in admitting the letter.

VI

■ American Family requested an instruction[5] which would have required that if the jury awarded punitive damages those damages must be reasonably proportionate to the amount of actual damages awarded Smith. American Family concedes that the instruction does not reflect the law in North Dakota but urges us to adopt such a rule. It notes that because we have adopted the view of the California courts which permit a punitive damages award, we should also adopt the California rule requiring a reasonable relationship between punitive and actual damages.[6] A review of the annotation cited in support of American Family's position indicates that some jurisdictions have adopted a rule such as that urged upon us by American Family, but it also reveals a number of jurisdictions which have rejected such a rule. Although the provision allowing assessment of punitive damages is statutory in North Dakota,[7] one

---

**4.** Rule 403 provides:
"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

**5.** The requested instruction reads:
"If you find Plaintiff is entitled to punitive damages in this case, you are instructed that the amount of punitive damages you decide to award must be reasonably proportionate to the amount of actual damages you have found the Plaintiff sustained. While there is no method of exact calculation as to punitive

damages nor any precise formula for the relationship of punitive damages to actual damages, the punitive damages must not be so disproportionate as to manifest that they were awarded as a result of passion or prejudice, or under any misconception or in disregard of the law or the evidence."

**6.** The rule is discussed in 17 A.L.R.2d 527 (1959) and the California cases supporting such a rule are listed therein and in the Later Case Service.

**7.** Section 32–03–07, N.D.C.C., provides:
"In any action for the breach of an obligation not arising from contract, when the defendant has been guilty of oppression, fraud,

of the early California cases adopting the rule that punitive damages must be in reasonable proportion to the actual damages suffered indicated that the courts have the authority to set aside a verdict for punitive damages. *Plotnik v. Rosenberg*, 55 Cal. App. 408, 203 P. 438 (1921).

The setting aside of a verdict that is excessive and an instruction to the jury that the punitive damages must be in reasonable proportion to the actual damages suffered are not necessarily the same thing. The cases cited in the annotation at 17 A.L.R.2d 527 (1951) and in the Later Case Service reflect that there is no precise formula for establishing punitive damages in reasonable proportion to the actual damages suffered. Those decisions relied upon by American Family do not hold it is error for a trial court to refuse to give an instruction that the punitive damages must be in reasonable proportion to the actual damages suffered. They do support the conclusion that the court has the right to set aside an excessive verdict for punitive damages. Even those cases cited as holding to the contrary agree that the authority of the fact-finder to award punitive damages is not unlimited. Thus in *Petsch v. Florom*, 538 P.2d 1011 (Wyo.1975), the Wyoming court stated:

> "The amount of punitive damages is largely in the discretion of the trial court. . . . Since the fact-finding function is passed on to the jury and it is left up to that body representing the sense of the community and its view of such matters, the quantity is for the most part then within its discretion.
>
> "We realize that there may be occasions when a court should set aside a verdict and judgment for punitive damages. While the amount to be awarded rests largely in the discretion of the jury, and taking into consideration the circumstances of each case, the 'discretion of the jury is not, however, an arbitrary or unlimited one. The jury is not at liberty to award by way of punitive damages any

amount, regardless of how large it may be.' 22 Am.Jur.2d (Damages) § 264, p. 359. . . ." 538 P.2d at 1014.

See also *Pezzano v. Bonneau*, 133 Vt. 88, 329 A.2d 659 (1974). Most courts hold that there is some limitation on the authority of the fact-finder to award punitive damages. The distinction between jurisdictions appears to center on whether a particular jurisdiction requires the award of punitive damages to be reasonably proportionate to the award of actual damages or whether the jurisdiction merely prohibits an award that is obviously grossly excessive.

In *Boise Dodge, Inc. v. Clark*, 92 Idaho 902, 453 P.2d 551 (1969), the Idaho court noted several jurisdictions, including its own, that limited the discretion of juries in imposing punitive damages by requiring that the amount of punitive damages must bear a reasonable relation to the amount of actual damages. In that case the jury awarded Clark $350 in actual damages and punitive damages of $12,500. The trial court had given an instruction which provided that an award of punitive damages "must not be so disproportionate to actual damages sustained as to be result of passion or prejudice rather than reason, and such an award must bear some reasonable relation or proportion to actual damages, and exemplary damages must bear some relation to damages complained of and cause thereof." 92 Idaho at 907, 453 P.2d at 556.

On appeal the Idaho Supreme Court affirmed the verdict, stating:

> "The amount of actual damages sustained by a plaintiff is one indication of the culpability of the defendant's acts, but it cannot be the sole criterion for the assessment of punitive damages. Also relevant is the prospective deterrent effect of such an award upon persons situated similarly to the defendant, the motives actuating the defendant's conduct, the degree of calculation involved in the defendant's conduct, and the extent of the defendant's disregard of the rights of others. These are legitimate concerns of

or malice, actual or presumed, the court or jury, in addition to the actual damages, may

give damages for the sake of example and by way of punishing the defendant."

the law, and the application of any fixed arithmetic ratio to all cases in which punitive damages are assessed would be arbitrary. It therefore must be recognized that the requirement of a 'reasonable relation' between actual and punitive damages serves as a rough device *available to trial and appellate courts for the purpose of paring down plainly extreme awards of punitive damages.*" [Emphasis supplied.] 92 Idaho at 908–909, 453 P.2d at 557, 558.

We have not heretofore imposed a requirement that the award of punitive damages be reasonably proportionate to the award of actual damages. Because we are not convinced that such a requirement is appropriate in this case, we do not impose it. Accordingly, it was not error for the trial court to refuse to give such an instruction.

### VII

Finally, American Family urges us to conclude that the damages awarded are excessive. Looking first to the $3,000 in compensatory damages awarded for breach of the implied obligation of good faith and fair dealing, American Family again points to the evidence concerning Smith's emotional condition and argues it does not support a conclusion that Smith suffered severe emotional distress. The jury did not award damages for severe emotional distress. As we have already noted, the jury found in its special verdict that Smith did not suffer severe emotional distress. Our review is limited to the consideration of whether or not there is substantial evidence to sustain the verdict. If there is such evidence we are bound by the verdict. *Chewakin v. St. Vincent,* 275 N.W.2d 300 (N.D.1979). The evidence we have referred to heretofore is sufficient to support the award of compensatory damages of $3,000 for breach of the obligation of American Family to deal fairly and in good faith with Smith and to support the $4,120 awarded by the jury for breach of contract.

Insofar as the award of $50,000 in punitive damages is concerned, American Family again argues that it is more than coincidence that such damages are exactly equal to Smith's automobile liability insurance policy limits. We have already indicated we do not intend to conjecture as to the basis for the jury's verdict. It is not the function of this court to make computations to show how the jury arrived at its verdict. *Everson v. Partners Life Ins. Co.,* 268 N.W.2d 794 (N.D.1978).

In this case the comments of the trial judge, made in a memorandum opinion denying a motion for a new trial, are pertinent:

"In the case at hand, American Family's denial of coverage coupled with its letter (P's Ex. 30) which directed legal assertion of a $1,000,000 claim against their own assured's privately retained lawyer for filing the declaratory judgment action and a claim of exemplary damages scarcely can be termed conscionable conduct. Substantial evidence supported the jury finding that Ex. 30 was inconsistent with the company's duty to give the interest of the insured as much concern by exercise of good faith and fair dealing as that of the carrier. The purpose of Ex. 30, according to Harrington, admittedly was coercive and would justify the jury in finding that the letter expressly conveyed an intended message of intimidation coloring the denial of policy coverage by the company with a lack of good faith and fair dealing."

Although we believe the award of $50,000 in punitive damages is ample, it is not, under the facts of this case, excessive. *Boise Dodge, Inc. v. Clark, supra.*

The order denying American Family's motions for judgment notwithstanding the verdict or, in the alternative, a new trial and the judgment are affirmed.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.