Robert L. STONER, Plaintiff, Appellee and Cross-Appellant,

v.

NASH FINCH, INC., Defendant, Appellant and Cross-Appellee.

Civ. No. 880239.

Supreme Court of North Dakota.

Sept. 26, 1989.

tal damages under the statute. See *Hofmann v. Stoller,* 320 N.W.2d 786 (N.D.1982).

Coles & Snyder, Bismarck, for plaintiff, appellee and cross-appellant; argued by Robert J. Snyder, Bismarck.

Lucas & Smith, Bismarck, for defendant, appellant and cross-appellee; argued by A. William Lucas, Bismarck.

GIERKE, Justice.

Nash Finch, Inc., appeals from a judgment entered on a jury verdict finding it liable to Robert L. Stoner for abuse of process and awarding Stoner $25,200 in compensatory damages and $200,000 in punitive damages. Nash Finch also appeals from orders denying post-trial motions. Stoner has filed a cross-appeal. We affirm.

The evidence, viewed in the light most favorable to the verdict, reveals that during 1985 Stoner was employed by Nash Finch as manager of its Warehouse Market in Bismarck. Stoner, age 51 at the time, had been employed for 17 years by Nash Finch, a national wholesaler and retailer of grocery products, and the company considered him a valued employee.

Based upon information supplied by a former employee of Nash Finch, Ronald Curran, a loss prevention manager for the company, conducted a secret investigation concerning Stoner's alleged acceptance from various product vendors of prizes and premiums which were routinely offered as part of sales promotions. Although Nash Finch sent out circulars to company employees once or twice a year which stated that this practice was prohibited,[1] the actual widespread practice in the company was for all levels of employees, including managers, supervisors, and headquarter personnel to accept and keep the premiums and prizes. Curran determined that Stoner had been accepting and keeping prizes and premiums through the years and compiled a list of those items. Curran contacted his supervisors at the home office in Minneapolis, and it was decided that Curran and Richard Wallace, vice president of the Warehouse Market division, would travel to Bismarck and confront Stoner with the results of the investigation.

On November 15, 1985, Curran and Wallace met with Stoner at a Bismarck motel, showed him the list of prizes and premiums, which totaled approximately $6,000, and asked if he had accepted the items. Stoner admitted that he had, with one exception, received the premiums and prizes

---

1. One such circular, dated May 1, 1985, and signed by the president of Nash Finch, stated:
   "COMPANY POLICY
   "For various reasons we find it necessary to reissue the following statement regarding our *Policy on Premiums.* It is your duty and responsibility that all your buyers, supervisors, store managers, department heads, etc. be aware of this policy. Be sure you advise all concerned.
   "PREMIUMS AND PRIZES
   "Many manufacturers at various times offer the Company merchandise deals that for its purchase or for any certain quantity of a purchase carries some kind of a premium or incentive to a buyer. Also, at times manufacturers have offered premiums or prizes including trips and cash awards to buyers for the sale of certain quantities of their merchandise.
   "We do not want our merchandise buying program influenced because of a premium, prize or cash award being connected with it. The only time we buy merchandise is when

we need it to sell on a turnover basis, or unless it is a new item that has been approved by the committee along the usual new line procedure plan.
   "Should merchandise be purchased that carries a premium, or should the sale of merchandise earn a premium, or in any other way a premium, prize or cash award is connected with any merchandise or any other scheme, the premium, prize or cash award, including trips become the property of the Company.
   "When the Company receives the premium, then the premium will be used by the Company in advertising or promoting, or some other manner that will help the business of the Company.
   "In other words, it is the Company that buys the merchandise and any benefit accruing from the purchase of [sic] sale of the Company's merchandise will accrue to the benefit of the Company and not to any individual person connected with the Company."

listed. At that point, Stoner was fired as an employee of Nash Finch.

After the Bismarck meeting, Wallace returned to Minneapolis. During the next several days, Wallace, Russell Mammel, the president of Nash Finch, and Stuart Deuring, house counsel for the company, discussed possible further actions to be taken against Stoner. One option discussed was to sue Stoner for the amount of premiums and prizes he received. According to Deuring, this option was rejected because it would be too "time-consuming", and, even if a judgment was obtained, it might not be collectable. Another option discussed was a possible criminal action. Deuring researched the matter and telephoned the office of the Burleigh County State's Attorney. He spoke with an assistant state's attorney and inquired as to the monetary levels for the various theft offenses and the possibility of a deferred imposition of sentence. Although the company was not interested in pursuing a felony charge, it was interested in a possible misdemeanor charge and restitution. Curran contacted Officer Myron Heinle of the Bismarck Police Department and told him that the company was investigating Stoner for possible theft of the premiums and prizes.

During this period of time, Nash Finch officials also became aware that, because of Stoner's termination of employment, he was eligible for a payout of his accumulated profit sharing monies. Company officials discovered that the amount of Stoner's payment would be far in excess of the amount of premiums and prizes received by him. Company officials also discovered that Stoner had granted Nash Finch a second mortgage on property located in Minnesota. The mortgage was given to secure a $15,000 loan from the company which Stoner used as a down payment for a home when he was transferred to Bismarck. At the time of Stoner's termination, the loan balance was approximately $7,500 and Stoner was making payments of $60 per week.

On December 5, 1985, Deuring and Curran met with Stoner at a Bismarck motel.

Deuring had with him several documents he had earlier prepared. Those documents included a blank demand promissory note and a "Release and Settlement Agreement" to which was attached a list of the amounts of premiums and prizes received by Stoner and the amount of the balance remaining due on the mortgage. One of the items admittedly accepted by Stoner, a VCR, was left off of the list. Deuring testified that at the meeting, the demand note and a criminal misdemeanor charge were "proposed to Mr. Stoner together." According to Stoner, Deuring told him that the amount of items he had received would constitute a felony, but that things had been "set up" so that if he pled guilty to a misdemeanor charge, the state's attorney would recommend to the judge that he receive a deferred imposition of sentence. Stoner was also informed that the reason charges were being filed was "to make this firing of me the most benefit to show other employees in the company that they wanted this practice stopped...." Stoner was then asked to sign the release and the demand note. After crossing one item off of the list, the amount of $13,271.45 was entered on the release and demand note, and Stoner signed the documents.

Immediately after the meeting, Deuring, Curran, and Stoner went to the Bismarck Police Department and met with Officer Heinle. Stoner told Heinle that he had taken the VCR, with an approximate value of $319, that it was a premium prize, and that he was aware of the company policy. Deuring and Curran told Heinle that, with regard to the balance of the $6,000 in premiums and prizes accepted by Stoner, the company "would attempt to be reimbursed through the civil process." Heinle prepared a report which was forwarded to the state's attorney. On December 18, 1985, Stoner was formally charged with class A misdemeanor theft of property, *i.e.*, the VCR.

In early January 1986, Deuring obtained Stoner's profit sharing check, which totaled approximately $22,000. On January 9, Deuring flew to Bismarck with the check and demand note. After arriving in Bismarck, Deuring accompanied Stoner to a

bank, where Deuring required that Stoner obtain a certified check made out to Nash Finch in the amount of the demand note. After receiving the check, Deuring gave Stoner the canceled demand note and satisfaction of mortgage and left.

Nash Finch officials soon learned that Stoner was considering bringing a lawsuit against the company. Deuring contacted the state's attorney and requested that the misdemeanor charge against Stoner be dismissed. According to Deuring, the reason for doing so was that the company had "no interest in defending lawsuits," and that the company had received the money owed to it. On February 20, 1986, the state's attorney filed a motion to dismiss the charge against Stoner, and the court ordered a dismissal on February 21, 1986.

Stoner subsequently brought this action against Nash Finch for malicious prosecution and abuse of process. The jury returned a verdict in favor of Nash Finch on the malicious prosecution action but found in favor of Stoner on the abuse of process action. The jury awarded Stoner $25,200 in compensatory damages and $200,000 in punitive damages. Nash Finch brought several post-trial motions which were denied by the court. These appeals followed.

## ABUSE OF PROCESS

Nash Finch asserts that the evidence was insufficient to sustain the jury's finding of abuse of process. In reviewing a jury verdict, we view the evidence in the light most favorable to the verdict and if there is substantial evidence to support the verdict, we will not set it aside. *E.g., Matter of Estate of Knudsen,* 342 N.W.2d 387, 392 (N.D.1984). We believe there was substantial evidence to support the jury's verdict in this case.

The tort of abuse of process is described in Restatement (Second) of the Law of Torts § 682 (1976): "One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." The essential elements of the tort are discussed in Prosser

and Keeton, *The Law of Torts* § 121, at p. 898 (5th ed. 1984):

"The essential elements of abuse of process, as the tort has developed, have been stated to be: first, an ulterior purpose, and second, a wilful act in the use of the process not proper in the regular conduct of the proceeding. Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort." [Footnotes omitted.]

In *A & A Metal Bldgs. v. I–S, Inc.,* 274 N.W.2d 183, 187 (N.D.1978), we said:

"The elements of abuse of process were discussed by this Court in *Blair v. Maxbass Security Bank of Maxbass,* 44 N.D. 12, 176 N.W. 98 (1919). In *Blair, supra* 176 N.W. at 100, we stated that an abuse of process can occur only when the facts constituting the abuse are done willfully. If the acts are done maliciously, exemplary damages can also be sought, but willfulness is the basic requirement. A person is liable for an abuse of process if he knowingly participates in the abuse of process. *Id.* Good faith, however, is a defense. *Id.*"

■ The evidence in this case permitted the jury to determine that after Nash Finch learned of the acceptance by Stoner of the prizes and premiums, the company had him terminated from employment. After having fired Stoner, however, Nash Finch could no longer use possible termination of employment to induce Stoner to return the value of the premiums and prizes. Nash

Finch considered civil litigation, but rejected the idea. Nash Finch discovered that Stoner would be receiving $22,000 in profit-sharing funds and that this amount would be sufficient to cover not only the value of the premiums and prizes, but also to satisfy the amount Stoner owed on the second mortgage which was not in default and therefore not immediately recoverable.

Deuring then drafted the demand note and release and met with Stoner. The jury could have inferred from the circumstances of the meeting that Deuring proposed that, unless Stoner signed the documents, he would be charged with a felony. In addition, Deuring assured Stoner that if he would plead guilty to a reduced misdemeanor charge, he would likely receive a deferred imposition of sentence and have no permanent record. Stoner thus signed the documents and the class A misdemeanor charge followed. Deuring then took the profit-sharing check to Stoner, had him cash it, and obtained a cashier's check for the amount owed to Nash Finch. Having achieved its goal of obtaining the money, Nash Finch had the class A misdemeanor charge against Stoner dismissed. The evidence is sufficient to support a finding of abuse of process.

Nash Finch asserts, however, that the jury could not consider any of the conduct of Nash Finch officials prior to December 18, 1985, the date the criminal complaint was filed, because abuse of process is based only on conduct which occurs after

legal process has been issued.[2] Nash Finch contends that the only two acts which occurred after December 18, *i.e.*, Deuring obtaining the money from Stoner and having the misdemeanor charge dismissed, are insufficient to sustain the verdict.

We reject this argument for two reasons. First, the actions of Nash Finch after December 18 cannot be viewed in a vacuum. The conduct of Nash Finch prior to issuance of the criminal complaint was certainly relevant to explain the motivation for the actions which took place thereafter, which culminated in the achievement of the company's objectives. Second, we believe that Nash Finch's extremely restrictive interpretation of the tort of abuse of process is unwarranted. It has been observed that:

> "Some of the decisions have said that there must be an improper act, such as an extortion attempt, after the process has issued and that an act committed beforehand is not enough. Most of these cases probably stand only for the narrower proposition that there must be an overt act and that bad purpose alone is insufficient. Thus a demand for collateral advantage that occurs before the issuance of process may be actionable, so long as process does in fact issue at the defendant's behest, and as a part of the attempted extortion." [Footnotes omitted.]

Prosser and Keeton, *supra.* *See also Huggins v. Winn–Dixie Greenville, Inc.*, 249 S.C. 206, 153 S.E.2d 693, 696 (1967).

> "1. That the defendant used a legal process in a wrongful manner, not proper in the regular conduct of a proceeding, to accomplish a purpose for which it was not designed;
> "2. That the defendant acted with an ulterior motive;
> "3. That a willful act or threat was committed by the defendant, not authorized by the process and not proper in the regular conduct of the proceeding;
> "4. That the plaintiff suffered damage, loss or harm;
> "5. That such damage, loss or harm was the proximate result of such use of the legal process.
> "The plaintiff must prove these essential elements by the greater weight of the evidence."

---

2. With regard to abuse of process, the jury was instructed:

"PART II
"ABUSE OF PROCESS

"An abuse of process is the misuse of the power of the court. It is an act done in the name of the court and under its authority by means of use of a legal process not proper in the conduct of a proceeding for the purpose of perpetrating an injustice.

"Abuse of process is distinguished from malicious prosecution in that it is based on conduct which occurs *after* legal process has begun, whereas malicious prosecution involves the *instituting* of the legal process. The crux of abuse of process then is improper use of the legal process after it is issued.

"As to Part II, the plaintiff must prove the following essential elements of his claim before you can find for the plaintiff:

We conclude that there is substantial evidence to support the jury's verdict on abuse of process.

## COMPENSATORY DAMAGES

Nash Finch asserts that the evidence is insufficient to support the jury's award of $25,200 in compensatory damages. We disagree.

▆▆▆ A jury may properly consider wounded feelings, mental suffering, humiliation, degradation, and disgrace in fixing compensatory damages. *Dahlen v. Landis*, 314 N.W.2d 63, 68 (N.D.1981). The determination of damages for pain and suffering and comparable losses is not susceptible of arithmetical calculation; rather, its ascertainment must, to a large degree, depend upon the common knowledge, good sense and practical judgment of the jury. *Dahlen v. Landis, supra; Lake v. Neubauer*, 87 N.W.2d 888, 891 (N.D.1958). In *Hoerr v. Northfield Foundry and Mach. Co.*, 376 N.W.2d 323, 326 (N.D.1985), we said:

> " 'There is no certain or definite rule by which the amount of damages can be measured, and each case must be determined on its merits. This determination is in the province of the jury and the matter of damages rests largely in the sound discretion of the jury.
>
> ... Before this court will interfere with the verdict on appeal, it must be so excessive or so inadequate as to be without support in the evidence.' " [Quoting *Vallejo v. Jamestown College*, 244 N.W.2d 753, 759 (N.D.1976)].

▆▆▆ Nash Finch's major complaint is that there was no specific evidence of damages suffered by Stoner after the complaint was filed on December 18, 1985, and that the plaintiff's evidence failed to distinguish between damages from termination of employment as opposed to abuse of process. Although Stoner and his wife had some difficulties differentiating whether Stoner's stress, humiliation, embarrassment, and sleepless nights resulted entirely from issuance of the criminal complaint or from the loss of his employment, we believe the evidence is sufficient to sustain the award. The jury was made aware by the trial judge and counsel during the course of the trial that it should not consider any damages sustained by Stoner as the sole result of his termination of employment. Stoner testified that, when he encountered people he knew, he was humiliated and embarrassed because of their knowledge of the criminal complaint. We do not believe the evidence of Stoner's emotional suffering is insufficient merely because he was unable to specifically pinpoint what percentage of suffering was caused by the issuance of the criminal complaint rather than the termination of employment.[3]

Nash Finch also asserts that the jury erroneously awarded Stoner $200 in attorney fees he incurred in defending the criminal action because such attorney fees are not a proper element of compensatory damages for abuse of process. The trial court instructed the jury in part:

## "MEASURE OF COMPENSATORY DAMAGES

"In arriving at the amount of your verdict for damages suffered by the plaintiff and arising from malicious prosecution or abuse of process, you may consider each of the following items of detriment which you find proximately resulted from the wrongdoing.

---

3. The tort of abuse of process, unlike the tort of negligent infliction of emotional distress, does not require "[s]pecific proof of intangible damages [such as " 'mental injury' "] ... as a prerequisite to an award if it is clear that such damages would accrue to a normal person." Prosser and Keeton, *The Law of Torts* § 121, at p. 900 (5th ed. 1984) [Footnote omitted.] *See also Continental Cablevision v. Storer Broadcasting Co.*, 653 F.Supp. 451, 461–462 (D.Mass.1986)

[construing Missouri law]; *Huggins v. Winn–Dixie Greenville, Inc.*, 252 S.C. 353, 166 S.E.2d 297, 301 (1969). Therefore, this case is distinguishable from *Muchow v. Lindblad*, 435 N.W.2d 918, 921–923 (N.D.1989), in which we analyzed the plaintiffs' alleged injuries from the viewpoint of the "bodily harm" required to support an independent action for negligent infliction of emotional distress.

"(1) Expenses incurred by the plaintiff in defending himself in the criminal prosecution, including reasonable attorney's fees;"

The record reflects that, during discussions between court and counsel regarding the jury instructions, Nash Finch had no objection to this instruction. Consequently, we deem this alleged error waived and decline to address the merits of the issue. *E.g., Hoerr v. Northfield Foundry and Mach. Co., supra,* 376 N.W.2d at 327; *Andersen v. Teamsters Local 116 Bldg. Club,* 347 N.W.2d 309, 313 (N.D.1984); *Smith v. Vuicich,* 699 P.2d 763, 765 (Utah 1985). We conclude that the jury's award of compensatory damages is supported by the evidence and is not excessive.

## PUNITIVE DAMAGES

Nash Finch asserts that there was insufficient evidence to establish malice, and therefore, to support an award of punitive damages.

■ Actual malice is the actual state or condition of the mind of the person who did the act. *Neidhardt v. Siverts,* 103 N.W.2d 97, 102 (N.D.1960). Presumed malice is "that state of mind which is reckless of law and of the legal rights of the citizen in a person's conduct toward that citizen." *Shoemaker v. Sonju,* 15 N.D. 518, 108 N.W. 42, 44 (1906). Direct evidence of actual malice is not required. Rather, "the character of the act itself, with all its surrounding facts and circumstances, may be inquired into for the purpose of ascertaining the motive or purpose which influenced the mind of the party in committing the act. Thus, upon the consideration of these, if that motive is found to be improper and unjustifiable, the law authorizes the jury to find it was malicious." *Dahlen v. Landis, supra,* 314 N.W.2d at 69.

■ We believe the evidence in this case is sufficient for the jury to find that Nash Finch acted maliciously. The circumstances permit the inference that Nash Finch, through use of the criminal process, schemed to, in effect, extort money from Stoner. The jury could determine that, under the circumstances, punitive damages were appropriate.

Nash Finch asserts that the jury's award of $200,000 in punitive damages is excessive.

■ Punitive damages are excessive when the amount of the award indicates passion or prejudice on the part of the jury. *Neidhardt v. Siverts, supra,* 103 N.W.2d at 103; *see also* Rule 59(b)(5), N.D.R.Civ.P. "'In determining on appeal whether [a] verdict was motivated by passion or prejudice, "passion" means moved by feelings or emotions, or may include sympathy as moving influence without conscious violation of duty, "prejudice" includes forming of opinion without due knowledge or examination.'" *Nelson v. Trinity Medical Center,* 419 N.W.2d 886, 894 (N.D.1988) [quoting *Skjonsby v. Ness,* 221 N.W.2d 70, 77 (N.D. 1974)].

■ The purpose of awarding punitive damages is to punish the wrongdoing defendant in order to deter him, and others, from repetition of the wrongful conduct. *Dahlen v. Landis, supra,* 314 N.W.2d at 68. Evidence of a defendant's wealth or lack of wealth may properly be considered by the jury when fixing punitive damages because the defendant's financial condition will necessarily have a bearing on the amount that will serve as meaningful punishment of the defendant. *Olmstead v. Miller,* 383 N.W.2d 817, 823 (N.D.1986).

The evidence reflects that Nash Finch is a large corporation with many divisions. During 1985 it owned approximately 50 Warehouse Markets, had 12 distributing centers, 385 affiliated supermarkets, several hundred non-affiliated retail sales institutions, a number of marketing subsidiaries, and approximately 6,000 employees. The company's gross income for fiscal year 1985 was approximately $1.3 billion. Its net profit for that year totaled $12 million.

In his complaint, Stoner sought punitive damages equaling "ten percent of the net revenues earned by defendant during its 1985 fiscal year." The jury awarded Stoner one-sixth of that amount. While $200,-000 is a large amount of money, we, like

the trial court, cannot say that the punitive damage award is excessive considering the conduct of Nash Finch and its size and wealth.

■ Nash Finch asserts that the $200,-000 punitive damage award violates the excessive fines, due process, and equal protection clauses of both the federal and state constitutions.[4]

With respect to Nash Finch's first argument, the Supreme Court has recently held that the excessive fines clause of the Eighth Amendment to the United States Constitution "does not apply to awards of punitive damages in cases between private parties." *Browning–Ferris Industries v. Kelco Disposal, Inc.,* —— U.S. ——, ——, 109 S.Ct. 2909, 2912, 106 L.Ed.2d 219 (1989). The excessive fines clauses of the federal and state constitutions are virtually identical,[5] and Nash Finch has posited no reasons for interpreting the state excessive fines clause differently from its federal counterpart. Accordingly, we conclude that the punitive damage award in this case does not violate the Eighth Amendment or Article I, Section 11 of the State Constitution.

■ In *Browning–Ferris Industries v. Kelco Disposal, Inc., supra,* —— U.S. at ——, 109 S.Ct. at 2921, the Supreme Court left open the question "whether due process acts as a check on undue jury discretion to award punitive damages in the absence of any express statutory limit." *See also Bankers Life & Casualty Co. v. Crenshaw,* 486 U.S. 71, ——, 108 S.Ct. 1645, 1654, 100 L.Ed.2d 62 (1988) (O'Connor, J., concurring). Nash Finch's arguments based on the due process and equal protection clauses of the state and federal constitutions are premised on its assertion that "North Dakota law regarding what type of conduct is punishable by exemplary damages is void for vagueness." Nash Finch asserts that the "vagueness" in the proscribed conduct, coupled with the "lack of objective guidelines by which to set the amount of punishment," results in "arbitrary punishment" in violation of these constitutional provisions.

The void-for-vagueness doctrine applies to civil statutes as well as criminal statutes. *See In Interest of E.B.,* 287 N.W.2d 462, 463 (N.D.1980); *In Re J.Z.,* 190 N.W.2d 27, 35–36 (N.D.1971). We have said that the due process clauses of the federal and state constitutions require definiteness of statutes so that the language, when measured by common understanding and practice, gives adequate warning of the conduct proscribed and marks boundaries sufficiently distinct for judges and juries to fairly administer the law. *E.g., State v. Schwalk,* 430 N.W.2d 317, 319 (N.D.1988). In determining whether the meaning of a statute is fairly ascertainable or adequate warning is given, we must view the statute from the standpoint of the reasonable person who might be subject to its terms. *E.g., State v. Tranby,* 437 N.W.2d 817, 821 (N.D.1989). A statute is not unconstitutionally vague merely because it does not specifically designate the various different means by which the statute is violated. *E.g., State v. Beyer,* 441 N.W.2d 919, 921 (N.D.1989).

Courts which have recently addressed similar arguments, *i.e.,* that various punitive damages schemes are unconstitutionally vague in defining conduct giving rise to liability and in providing standards for assessing the amount, have found no due process violation. *See, e.g., Horowitz v. Schneider Nat'l, Inc.,* 708 F.Supp. 1573, 1578 (D.Wyo.1989) [construing Wyoming law]; *Kociemba v. G.D. Searle & Co.,* 707

---

4. Nash Finch first raised the constitutional issues in a motion for relief from judgment on exemplary damages under Rule 60(b), N.D.R. Civ.P. The trial court found the motion allowable under Rule 60(b)(vi), considered the motion on the merits, and upheld the constitutionality of the punitive damage award. We deem the constitutional questions to be properly before us in this appeal. *See In re Estate of Jensen,* 162 N.W.2d 861, 876 (N.D.1968).

5. The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed nor cruel and unusual punishments inflicted." Article I, Section 11 of the State Constitution provides in pertinent part: "Excessive bail shall not be required, nor excessive fines imposed, nor shall cruel or unusual punishments be inflicted."

F.Supp. 1517, 1535–1536 (D.Minn.1989) [construing Minnesota law]; *Guy v. Commonwealth Life Ins. Co.*, 698 F.Supp. 1305, 1316 (N.D.Miss.1988) [construing Mississippi law]; *Federal Deposit Ins. Corp. v. W.R. Grace & Co.*, 691 F.Supp. 87, 97–100 (N.D.Ill.1988), *affirmed in part and reversed in part on other grounds*, 877 F.2d 614 (7th Cir.1989) [construing Illinois law]; *Palmer v. A.H. Robins Co., Inc.*, 684 P.2d 187, 214–216 (Colo.1984); *Potomac Electric v. Smith*, 79 Md.App. 591, 558 A.2d 768, 790–792 (1989). California courts in particular, construing their punitive damage provision which is "substantially similar" to our own [*Olson v. Fraase*, 421 N.W.2d 820, 828 (N.D.1988)], have repeatedly upheld the statute against attack on due process grounds. *See, e.g., Radell v. Comora*, 211 Cal.App.3d 1244, 259 Cal. Rptr. 891, 898–900 (1989); *Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d 757, 174 Cal.Rptr. 348, 383 (1981); *Bertero v. National General Corporation*, 13 Cal.3d 43, 118 Cal.Rptr. 184, 529 P.2d 608, 625 n. 13 (1974); *Fletcher v. Western National Life Insurance Co.*, 10 Cal.App.3d 376, 89 Cal. Rptr. 78, 96 (1970); *Toole v. Richardson–Merrell, Inc.*, 251 Cal.App.2d 689, 60 Cal. Rptr. 398, 419 (1967).

We agree with the rationale used by these courts. The version of § 32–03–07, N.D.C.C., which was in effect when this action accrued,[6] provided that: "In any action for the breach of an obligation not arising from contract, when the defendant has been guilty of oppression, fraud, or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example and by way of punishing the defendant." We believe that the statutory terms "oppression, fraud, or malice" have well-established meanings, are sufficiently clear to persons of ordinary intelligence to afford a practical guide for behavior, and are capable of application in an even-handed manner. *See Palmer v. A.H. Robins Co., Inc., supra; Fletcher v. Western National Life Insurance Co., supra.* Moreover, in view of the detailed instructions given in this case concerning when the conduct of the defendant qualifies for imposition of punitive damages, we cannot say that the jury was without meaningful standards to guide it.[7]

---

**6.** Section 32–03–07, N.D.C.C., is "suspended" from July 8, 1987 through June 30, 1993. *See* 1987 N.D.Sess.Laws Ch. 404, § 15.

**7.** The jury instructions on punitive damages included the following:

"EXEMPLARY DAMAGES

"In an action for malicious prosecution or abuse of process, if the wrongdoer has been guilty of oppression or malice, as defined in these instructions, in your discretion, in addition to the actual or compensatory damages, you may award the injured party any further reasonable sum as an example to others and to punish the wrongdoer as you consider just. Those damages are called exemplary or punitive damages and are distinguished from damages that compensate for the detriment caused and which are called actual or compensatory damages.

"However, you may not award exemplary or punitive damages against the defendant in this action unless you find that the plaintiff has proven the essential elements of his claim and that the defendant acted with oppression or malice as defined in these instructions.

"OPPRESSION

"For the purposes of exemplary damages, the term 'oppression' is defined as an act of cruelty, severity, unlawful exaction, or excessive use of authority. It is an act of subject-ing to cruel and unjust hardship, or an act of domination.

"MALICE

"The terms 'malice' and 'maliciously' import a wish to vex, annoy, or injure another person, or an intent to commit a wrongful act, established either by proof or presumption of law. Malice may consist of (1) a direct intention to injure another or (2) a reckless disregard of another's rights and the consequences that may result. Malice is not limited to a spiteful, malignant, or revengeful disposition and intent; it includes wrongful and improper motives as well as intent to commit a wrongful and improper act. If a wrongful or unlawful act is willfully or deliberately committed, the law presumes that the act was committed with unlawful intent.

"BURDEN OF PROOF

"*Exemplary Damages*

"Previously you were instructed that the plaintiff must prove the essential elements of his claims and also compensatory damages by the greater weight of the evidence.

"However, when the jury considers exemplary damages, the plaintiff must prove the oppression or malice by clear and convincing evidence before it may award exemplary damages.

"'Clear and convincing' means there remains no serious or substantial doubt as to

We are also not persuaded that the punitive damages provision is constitutionally defective for lack of "objective guidelines" by which to set the amount of damages. In *Federal Deposit Ins. Corp. v. W.R. Grace & Co., supra*, 691 F.Supp. at 99, the court said:

> "[I]t is incorrect to say that a jury has unbridled discretion to establish the size of the punitive damage award. First, the jury is instructed that it should set the award in an amount 'which will serve to punish the defendant and to deter others from the commission of like offenses.' Thus the jury is instructed that its verdict should be, in effect, large enough to serve as a punishment and as a deterrence. Consequently the jury is to consider the station, wealth, and activities of the defendant and of others in a position to commit similar offenses. The jury does not do this in a vacuum, it has the arguments of counsel on both sides to assist it in making these determinations. Thus a jury would know that a sizeable amount would be necessary in a case involving a defendant of the size of Grace, while on the other hand it would know that a much smaller verdict would be necessary to punish a blue collar worker."

Moreover, punitive damage awards will not be upheld on appeal if they are excessive. *E.g., Dahlen v. Landis, supra*. Although this court does not require that punitive damages be in reasonable proportion to the actual damages suffered [*Smith v. American Family Mut. Ins. Co.*, 294 N.W.2d 751, 766 (N.D.1980)], we have recognized that the "ratio rule" used by some courts is but " 'a handy expression for the idea that the punitive award in a particular case is excessive.' " *Dahlen v. Landis, supra*, 314 N.W.2d at 70 [quoting Dobbs, Handbook on the Law of Remedies, § 3.9, at 211]. In addition, the allowance for motions for new trial and judgment notwithstanding the verdict under the Rules of Civil Procedure and the practice of remittitur at both the trial and appellate levels

also act to limit the discretion of the jurors and prevent unfair awards of punitive damages. *See* Rules 50(b) and 59(b)(5), N.D.R. Civ.P.; *Guy v. Commonwealth Life Ins. Co., supra; Radell v. Comora, supra*. As the court stated in *Federal Deposit Ins. Corp. v. W.R. Grace & Co., supra*, 691 F.Supp. at 100:

> "The system for punishing defendants who commit torts in a wilful and wanton manner has served us for over two hundred years, has been adopted for use in at least forty-six of the fifty states, and has not been subjected to constitutional attack until this year. No reason to date has been put forth of why a system that has been around such a long time is suddenly so fundamentally unfair so as to deny due process."

From the arguments presented, we find that the procedure for assessment of punitive damages violates neither the due process nor equal protection clauses of the state and federal constitutions.

We have considered the other arguments raised by Nash Finch and deem them to be without merit. Our disposition of this appeal renders it unnecessary to consider the issues raised by Stoner in his cross-appeal. Accordingly, the judgment and orders denying Nash Finch's post-trial motions are affirmed.

ERICKSTAD, C.J., and VERNON R. PEDERSON, Surrogate Justice, concur.

MESCHKE, J., concurs in the result.

VERNON R. PEDERSON, Surrogate Justice, sitting in place of
VANDE WALLE, J., disqualified.

LEVINE, Justice, concurring and dissenting.

I concur in all but the resolution of the constitutionality of the award of exemplary damages under the due process clause of the federal constitution. I do not believe the parties have adequately briefed the state constitutional excessive fines clause

the correctness of the conclusion; or, restated, that amount of evidence which produces in the mind of the jury a firm belief or

conviction about the existence of oppression or malice."

and therefore I agree with the majority that the punitive damage award does not violate Art. I § 11 of the State Constitution.

Trying to predict what the United States Supreme Court will do with a particular issue reminds me of a game of darts—you aim for a bull's-eye but are satisfied with anything that approaches the mark. However, try we must, and my review of recent United States Supreme Court cases dealing with the impact of due process on punitive damages leads me to believe that at least a majority of the present Court would strike, as a violation of federal due process, the $200,000 award of exemplary damages in this case.

The trial court instructed the jury in accord with North Dakota law that in addition to compensatory damages, it may award the injured party "any further reasonable sum as an example to others and to punish the wrongdoer as you consider just." That is the sum and substance of the guidance to the jury for setting the amount of punitive damages in this case.

While it is a given that compensatory damages may be awarded in an amount the jury deems appropriate, compensatory damages, by and large, are based upon proof of actual injury including specific monetary losses as well as more indeterminate injuries such as pain and suffering, humiliation and wounded feelings. Punitive damages, however, are awarded, not to compensate for injury but rather "to punish the wrongdoer in order to deter him (sic), and others, from repetition of the wrongful conduct." *Dahlen v. Landis,* 314 N.W.2d 63, 68 (N.D.1981). As Justice O'Connor stated in a separate concurring opinion in *Bankers Life & Casualty Co. v. Crenshaw,* 486 U.S. 71, 108 S.Ct. 1645, 1655, 100 L.Ed.2d 62 (1988), in which Justice Scalia also joined:

"Punitive damages are not measured against actual injury, so there is no objective standard that limits their amount. Hence, 'the impact of these windfall recoveries is unpredictable and potentially substantial.' *Electrical Workers v.*

*Foust,* 442 U.S. 42, 50, 99 S.Ct. 2121, 2127, 60 L.Ed.2d 698 (1979). For these reasons, the Court has forbidden the award of punitive damages in defamation suits brought by private plaintiffs, *Gertz [v. Robert Welch, Inc.], supra,* 418 U.S. [323] at 349–359, 94 S.Ct. [2997] at 3011–3012 [41 L.Ed.2d 789 (1974) ], and in unfair representation suits brought against unions under the Railway Labor Act, *Electrical Workers, supra,* 442 U.S., at 52, 99 S.Ct., at 2128. For similar reasons, the Court should scrutinize carefully the procedures under which punitive damages are awarded in civil lawsuits."

Justice O'Connor's analysis of Mississippi law on punitive damages noted that "the amount of the penalty that may ensue is left completely indeterminate." *Id.* 108 S.Ct. at 1656. Under Mississippi law, juries may award any amount of punitive damages against a defendant who acted with a wrongful animus, leading Justice O'Connor to conclude that "because of the punitive character of such awards, there is reason to think that this may violate the Due Process Clause." *Id.* at 1655.

I see no difference between the unbridled discretion of North Dakota juries and that of Mississippi juries. While evidence of a defendant's wealth may properly be considered in fixing punitive damages, *Dahlen v. Landis, supra,* 314 N.W.2d at 68, the amount of punitive damages rests in the sound discretion of the jury. *Neidhardt v. Siverts,* 103 N.W.2d 97, 102–03 (N.D.1960). In this case, no instruction was given on tying the amount of punitive damages to the wealth of the defendant. Nor was the jury instructed to consider the evil of the act or the harm visited upon the plaintiff. But I do not believe a different result would ensue even had those instructions been given. I believe Justice O'Connor would hold in this case that the unguided discretion of the jury to assess $200,000 as exemplary damages violates the defendant's right to due process under the United States Constitution. *See Browning–Ferris Industries v. Kelco Disposal, Inc.,* —— U.S. ——, 109 S.Ct. 2909, 2924, 106 L.Ed.2d 219 (1989).

Furthermore, since Justice Scalia joined Justice O'Connor in *Bankers Life*, and Justice Stevens joined her in *Browning–Ferris*, I believe they, too, would conclude that North Dakota law on assessing the amount of punitive damages is so vague and elucidating as to provide a jury no guidance, no standards and no constraints, thereby violating a defendant's right to due process.

Justice Brennan, writing specially in *Browning–Ferris*, and joined by Justice Marshall, pointed out that the due process clause forbids damage awards that are "grossly excessive" or "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable. [Citations omitted.]" *Id.* 109 S.Ct. at 2923. However, I am less concerned that the award in this case is "obviously unreasonable" because of its excessiveness, than I am over the absence of standards and guidelines for the jury to act upon in setting the amount of exemplary damages. Therefore, I believe Justice Brennan's comments on the subject of standards are instructive:

> "Without statutory (or at least common-law) standards for the determination of how large an award of punitive damages is appropriate in a given case, juries are left largely to themselves in making this important, and potentially devastating, decision. Indeed, the jury in this case was sent to the jury room with nothing more than the following terse instruction: 'In determining the amount of punitive damages, you may take account of the character of the defendants, their financial standing, and the nature of their acts.'" *Id.*

Justice Brennan characterized the "guidance" of the quoted jury instruction as "scarcely better than no guidance at all." The only guidance for juries on the issue of punitive damages is "little more than an admonition to do what they [*i.e.*, the jury] think is best." *Id.* Since the "touchstone of due process is protection of the individual against arbitrary action of government," *id.*, Justice Brennan would "look longer and harder at an award of punitive damages based on such skeletal guidance" than

he would scrutinize an award of punitive damages "situated within a range of penalties as to which responsible officials had deliberated and then agreed." *Id.* The jury instruction in this case didn't even make reference to the financial standing of the defendant or the nature of its acts. Applying Justice Brennan's views to this case, I believe he and Justice Marshall would conclude that the jury was merely admonished to do what it thought "best" and such guidance being no guidance at all, is a violation of due process.

In *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983), Chief Justice Rehnquist launched his dissent on the issue of the requisite degree of a defendant's culpability in a § 1983 action to justify punitive damages with a polemic against punitive damages in general. He noted that punitive damages awarded by a jury are unaccompanied by the safeguards present in criminal proceedings though punitive damages are themselves criminal in nature; that punitive damages are frequently based upon the caprice and prejudice of jurors; that punitive damages may be employed to punish unpopular defendants; that punitive damages are assessed in wholly unpredictable amounts bearing no necessary relation to the actual harm caused; that the deterrence allegedly achieved by punitive damages is likely outweighed by the costs, "at least when the standards on which the awards are based are ill-defined." 461 U.S. at 59, 103 S.Ct. at 1641. One need not be a soothsayer to discern from this dissent the unfriendly attitude of the Chief Justice to the doctrine of punitive damages.

North Dakota has an additional problem because we have no requirement that an award of punitive damages be reasonably proportionate to an award of compensatory damages. *Olmstead v. Miller*, 383 N.W.2d 817, 822 (N.D.1986); *Smith v. American Family Mutual Insurance Co.*, 294 N.W.2d 751, 766 (N.D.1980). Thus, North Dakota juries are left completely to their own notions of what is sufficient punishment and what is sufficient deterrence in setting the amount of punitive damages.

So too, our trial courts, in reviewing those damages on motions for a new trial, are left to their own devices in deciding whether or not an award is "excessive" to a degree that demonstrates passion and prejudice. Similarly, this court is faced with the same problems. There are simply no objective standards which guide a jury in its assessment of punitive damages, or a trial court in its review of that assessment, or this court in its appellate review.

Whether or not the $200,000 award of punitive damages in this case is excessive, therefore, is truly in the eye of the beholder. There is a direct causal relationship between such rank subjectivity and the complete lack of standards and guidance against which an award of punitive damages may be tested. I believe a majority of the United States Supreme Court would hold that the absence of any standards is fundamentally unfair and contrary to the due process clause of the United States constitution. I would, therefore, reverse the award of punitive damages and suggest that the Legislature act to provide standards to govern the amount of punitive damages, or absent legislative action, that this court adopt, as has California, *e.g.*, *Radell v. Comora*, 211 Cal.App.3d 1244, 259 Cal.Rptr. 891, 899 (1989), at the very least, some rule of proportionality.