In re Lora ECKROTH, Debtor.

Allen Sickler, Plaintiff,

v.

Lora Eckroth, Defendant.

Bankruptcy No. 99–31520.

Adversary No. 99–7086.

United States Bankruptcy Court,
D. North Dakota.

April 13, 2000.

Kent M. Morrow, Bismarck, ND, for plaintiff.

Ross Espeseth, Bismarck, ND, for defendant.

### MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The Plaintiff, Allen Sickler ("Sickler"), commenced the instant adversary proceeding by Complaint filed December 6, 1999, seeking to determine the dischargeability of a contingent unliquidated claim he has against his former spouse, Lora Eckroth ("Eckroth"), the Debtor herein, for damages allegedly suffered as a consequence of actions he believes constitute malicious prosecution and/or abuse of process under North Dakota law. Sickler argues, in consequence, that any damages resulting are nondischargeable under section 523(a)(6) of the United States Bankruptcy Code. These circumstances gave rise to a civil suit venued in the North Dakota state courts, the continued prosecution of which was stayed by the Debtor's intervening bankruptcy petition.

It is understood by the parties that this Court will not make any findings relative to damages but will only make a determination based upon the evidence before it of whether the facts establish the elements of "willful and malicious" necessary for nondischargeability of Sickler's claim under section 523(a)(6).

Trial was held on March 28, 2000. From the evidence presented and the Stipulation of Uncontested Facts, the Court finds the facts, as material, to be as follows:

### Findings of Fact

After a marriage of brief duration the parties were divorced by decree entered September 14, 1998, by the North Dakota State District Court for Dunn County which awarded custody of their minor child to Eckroth subject to visitation rights accorded to Sickler. The matter of visitation and how it was to be effectuated was the subject of previous court proceedings and is at the heart of the instant cause of action.

From Eckroth's point of view, problems developed in the marriage almost immedi-

ately with concerns expressed over Sickler's physical shaking of her other child on the morning following their July 12, 1997 wedding. The relationship remained tense after this event and in October Eckroth returned to her parents' home at the same time commencing divorce proceedings. Sickler, dismayed over this turn of events and still professing love for Eckroth, begged her to come back. In late 1997 he began to make phone calls to her and, using an alias, sent her two letters which he admitted at trial were threatening but which he explained were prompted by his earnest desire to get back together. At this time his father was dying which put him under additional stress. Nevertheless, Eckroth took the letters to be threatening and went back to court seeking a protective order. On January 7, 1998, the North Dakota State District Court for Morton County issued a permanent protective order determining that, "there has been a showing of actual or eminent domestic violence." The court ordered Sickler restrained from harassing, threatening, molesting or injuring Eckroth or the children in any manner. He was ordered not to telephone, write, or contact her in any fashion or be within 25 yards of her. Noted upon the order, which Sickler admitted he understood, was the provision that a violation would constitute a Class A Misdemeanor punishable up to a year imprisonment and a fine up to $1,000.00.

At trial, Sickler testified he had read through the order, knew what it meant and knew he had to stay away.

On August 1, 1998, events unfolded during child visitation that Eckroth perceived as threatening and a possible violation of the protective order.

Consistent with an interim order, the parties have previously handled Sickler's visitation through third parties. Basically, one of Sickler's sisters would arrive at a predetermined meeting point, usually the Bismarck Kelly Inn, and Eckroth would give the child to the sister who would, in turn, give it to Sickler who, under the supervision of his mother and sister, would exercise his visitation rights. Up until August 1, 1998, Sickler was never physically present at and never personally participated in the visitation exchange.

On August 1, he was at a family get together at his sister's home and rather than disturb anyone else, decided to drive his sister, Carol Zent, over to the Kelly Inn for the visitation exchange. Accompanying them was Carol's minor son.

Sickler, well aware of the no contact and 25 yard restrictions, drove his pickup into the Kelly Inn parking lot where, he says, he parked at a distance well beyond the 25 yard limit. Although not sure how far away from the front door he actually was, he thought he was in compliance with the protective order.

Eckroth and her friend, Kris Vogel, were waiting in the Kelly Inn lobby. Kris said she could see the pickup just outside the entrance doors. Sickler and his sister, on the other hand, were firm in testifying that the truck was parked a long distance away from the front door. Sickler stayed in the pickup while his sister, Carol, went into the motel lobby where Eckroth was waiting with the child. She did not mention Sickler or the fact that he had driven her and was waiting in the pickup outside. With the baby in arms, Carol left the motel through the front doors heading towards the pickup. Sickler, thinking she needed some assistance, got out of the pickup, passed around the front of it and opened the vehicle's third door for her. Meanwhile, Eckroth had followed Carol out of the motel unaware Sickler was nearby. She testified that as she exited the front door she saw the pickup to her immediate right and saw Sickler who was only ten yards away. On cross-examination she persisted in her recollection that the pickup was very close—right beside her. On further examination Kris Vogel also testified that the pickup was very close to the front door—about 15 feet away or so. From this conflicting testimony, the precise location of the pickup is not established. Nonetheless, the pickup was close

enough to the motel doors to be seen by Eckroth and close enough for her to recognize Sickler.

Perceiving there may have been a violation of the protective order, Eckroth called the Bismarck police department for advice. They told her to come down to the station with the protective order in hand. She also called the abuse department and was told by them that she had done the right thing in calling the police. At the police department she showed an officer the protective order and told him her version of the events at the Kelly Inn. She did not ask to have Sickler arrested but the officer advised her that was what he was going to do.

Sickler, after leaving the motel with his sister and the baby, went back to the family gathering. A short time later the Bismarck police arrived and he was arrested, spending Saturday night and all of Sunday in the Burleigh County jail. His arrest and detention caused him embarrassment and prevented him from returning to his farm to complete a harvest which was in progress. Wheat, which had been swathed and ready for combining, was blown away by heavy winds.

### Conclusions of Law

Section 523(a)(6) of the Bankruptcy Code makes a debt nondischargeable for any willful and malicious injury caused by a debtor to another person.

■ If Sickler has a cognizable claim against the Debtor, it is one which must come within the ambit of malicious prosecution or abuse of process. In turn, if that claim, to the extent that it exists, is to be rendered nondischargeable in bankruptcy the actions of Eckroth giving rise to the claim must be both willful and malicious with Sickler bearing the burden of proving both elements by a preponderance of the evidence. *In re Montgomery,* 236 B.R. 914, 922 (Bankr.D.N.D.1999); *In re Slominski,* 229 B.R. 432, 435 (Bankr.D.N.D. 1998).

■ In the wake of the Supreme Court's decision of *Kawaauhau v. Geiger,*

523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), the concept of willfulness as used in section 523(a)(6) means that Eckroth must have acted with the express intent to harm Sickler rather than merely acting intentionally in a way that resulted in harm. *See also In re Scarborough,* 171 F.3d 638 (8th Cir.1999), *In re Novotny,* 226 B.R. 211 (Bankr.D.N.D.1998). Additionally, the actions must have been malicious meaning that they must have gone to a higher level of culpability. In *Johnson v. Miera (In re Miera),* 926 F.2d 741 (8th Cir.1991), the court ruled that maliciousness is conduct that is not only targeted at the creditor but is conduct *"committed without just cause or excuse."* (emphasis added)

■ Abuse of process and malicious prosecution are both intentional torts— malicious prosecution being distinguished from abuse of process primarily by its timing. Malicious prosecution arises from the wrongful institution of legal proceedings whereas abuse of process arises from wrongful conduct committed during the pendency of legal proceedings. The North Dakota Supreme Court has adopted the Restatement definition of abuse of process as a situation where "one uses legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed." Restatement (Second) of Torts § 682 (1976). The gist of the cause of action is the misuse or misapplication of legal process to accomplish an end other than that which the process was a design to accomplish. *Wachter v. Gratech Company, Ltd.,* 608 N.W.2d 279 (N.D.2000); *Volk v. Wisconsin Mortgage Assurance Co.,* 474 N.W.2d 40, 42 (N.D.1991); *Stoner v. Nash Finch, Inc.,* 446 N.W.2d 747 (N.D.1989). In *Stoner, id.,* the court approved the following jury instruction relative to abuse of process:

"An abuse of process is the misuse of the power of the court. It is an act done in the name of the court and under its authority by means of use of a legal process not proper in the conduct of a

proceeding for the purpose of perpetrating an injustice.

Abuse of process is distinguished from malicious prosecution in that it is based on conduct which occurs after legal process has begun, whereas malicious prosecution involves the instituting of the legal process. The crux of abuse of process then is improper use of the legal process after it is issued.

As to II, the plaintiff must prove the following essential elements of his claim before you can find for the plaintiff:
1. That the defendant used a legal process in a wrongful manner, not proper in the regular conduct of a proceeding, to accomplish a purpose for which it was not designed;
2. That the defendant acted with an ulterior motive;
3. That a willful act or threat was committed by the defendant, not authorized by the process and not proper in the regular conduct of the proceedings;
4. That the plaintiff suffered damage, loss or harm;
5. That such damage, loss or harm was the proximate result of such use of the legal process.

The plaintiff must prove these essential elements by the greater weight of the evidence."

In *Kummer v. City of Fargo*, 516 N.W.2d 294 (N.D.1994), the Supreme Court, recalling the Restatement definition, said that abuse of process focuses upon misuse of the legal process to obtain a collateral advantage or ulterior purpose not directly involved in the proceeding itself. *Kummer* at 298.

 The elements essential to a claim of malicious prosecution are similar. The North Dakota Supreme Court, adopting the definition of malicious prosecution set forth in *Prosser & Keeton,* the Law of Torts (5th ed.1984), holds the elements of proof to be the following:
1. Institution of a criminal proceeding by the defendant against the plaintiff;
2. Termination of the criminal proceeding in favor of the accused;

3. *Absence of probable cause* for the criminal proceeding; and
4. *Malice.* (emphasis added)

Malice, for purposes of a malicious prosecution action is said to be a primary purpose other than bringing an offender to justice. *Kummer, supra* at 298; *Richmond v. Haney,* 480 N.W.2d 751, 755 (N.D.1992).

As with abuse of process, it is useful in defining what constitutes a malicious prosecution to consider the jury instruction for this tort:

"One who institutes a criminal prosecution against another person maliciously and *without probable cause* is liable to the injured person in an action for malicious prosecution.

A criminal prosecution is instituted without probable cause if:
1. The charge or claim is false;
2. The complainant *had no reason* to believe the claim was true, and
3. The criminal prosecution terminated favorably to the accused.

If the criminal prosecution was instituted without probable cause the jury may infer it was instituted maliciously.

A person who institutes a criminal prosecution and *has probable cause* for doing so, cannot be held liable for malicious prosecution regardless of how maliciously he acted.

One has probable cause to initiate a criminal prosecution if, upon facts known or reported to him, he *honestly believed* he was entitled to initiate the prosecution."

North Dakota Pattern Jury Instructions— Civil No. 500 and 505. (emphasis added)

 The essential problem for Sickler under either of the foregoing tort theories is overcoming Eckroth's likely defense, developed during trial, that she had probable cause for thinking Sickler had violated the protective order and that her action in contacting the police was proper given the circumstances and the language of the or-

der itself. Whether Sickler was *actually* outside the 25 yard limit is not important to the consideration. What is important is what Eckroth perceived to be the situation and she thought he was inside the 25 yard limit and in violation of the protective order. Nothing in the facts before the Court suggests she is lying or did not have an honest belief in this. Nothing in the facts suggest an ulterior motive.

From the evidence presented, this Court is unable to conclude that Eckroth's motivation in contacting the police was improper or was designed specifically to injure Sickler as opposed to cloaking her with the measure of safety set forth in the protective order. Focusing upon the second element of malice, the evidence falls short of establishing that she acted without just cause or excuse. Indeed, she had the excuse which was the protective order and she thought she had the cause whether or not she was correct.

### Conclusion

Based upon the facts as developed from the evidence presented, the Court concludes that the Plaintiff, Allen Sickler, has failed to carry his burden of proof on the elements necessary to finding that the Defendant/Debtor, Lora Eckroth, acted either willfully or maliciously as these terms are used in section 523(a)(6) and consequently, any damages that might be awarded by another court as arising out of Sickler's claim for malicious prosecution and/or abuse of process will be discharged in bankruptcy.

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

**SO ORDERED.**